UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**LYNDELL LEROY PRICE**<br><br>**Defendant.** | **CASE NO. 4:24-CR-565-S** |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS INDICTMENT WITH PREJUDICE OR IN THE ALTERNATIVE TO SUPPRESS EVIDENCE

Although forfeiture by wrongdoing is a limited exception to the Sixth Amendment's Confrontation Clause, the spirit of this legal doctrine is certainly awakened in the context of the Defendant's attempt to manipulate the attorney-client relationship and then declare a conflict of interest in hopes of escaping justice. The United States of America respectfully files this motion opposing the Defendant's motion to dismiss the indictment with prejudice or suppress evidence, and in support thereof would show the following:

### MANIPULATION OF THE ATTORNEY-CLIENT RELATIONSHIP

The Defendant created the environment for attorney conflicts of interest to arise and now seeks to use it to his advantage.

In the Defendant's post-arrest interview, he proudly stated that he has a crew of "ranch hands", to include Co-Defendant John Lee Price and "Troy", who do work for him. Encl. 1, 43:40. Later in the same interview, the Defendant admitted that despite the success of the Turkey Leg Hut, of which he was a de facto owner, he made side money selling cars. *Id.* at 48:50. This is consistent with information provided by Co-Defendant John Lee Price (hereinafter "JLP") that

JLP and other "*ranch hands*" stole vehicles, heavy equipment, and other valuable items at the Defendant's direction. *See* Encl. 2.  JLP also advised that he sold marijuana in a back parking lot at the Turkey Leg Hut at the Defendant's direction and gave the proceeds to the Defendant. *See* Encl. 3.  JLP and other "*ranch hands*" also set fire to Bar 5015 at the Defendant's direction and in exchange for payment from the Defendant. *See* Encl. 2.

In order to maintain control of and keep tabs on his "*ranch hands*", the Defendant provided direction and influence over their choice of legal counsel when criminal legal issues arose.  SA Brian Ritchie testified that J.C. and J.O., individuals the Defendant identified during his post-arrest interview as his best friends, brought the Defendant's long-standing attorney, Robert Jones, to their FBI interviews.  ECF No. 98, 38:12-25.  During both interviews, as the subject of the interview turned to the Bar 5015 arson, Attorney Jones voiced a possible conflict of interest that changed the tone and tenor of these interviews.  *Id.* 39:1-22.

Regarding the Defendant's manipulation of JLP's choice of attorney, SA Ritchie testified that he heard a voice he believed to be the Defendant's telling JLP to call Attorney Carl Moore, the Defendant's then-business partner, as SA Ritchie stood outside the door to Co-Defendant JLP's apartment waiting to serve a DNA warrant.  *Id.* 36:16-24.  As instructed, JLP did contact Attorney Moore and put him on the phone with SA Ritchie.  *Id.* 36:25; 37:1-18.  Consistent with this account, Attorney Letitia Quinones-Hollins testified that JLP advised her that the Defendant instructed JLP to call Attorney Jones or Attorney Moore whenever a need arose for an attorney. *Id.* 20:13-23.  After JLP was arrested in Mississippi on federal drug charges, he in-fact followed the Defendant's instructions and retained Attorney Moore.  Because Attorney Moore, as a matter of practice, brings Attorney Quinones-Hollins into his federal cases, JLP's defense team included both Attorney Moore and Attorney Quinones-Hollins.  *Id.* 21:2 – 5.

The Defendant now cries conflict of interest, yet he set the wheels in motion for Attorney Quinones-Hollins to represent JLP. The Defendant trapped himself in his own web of manipulation and now seeks a scapegoat in Attorney Quinones-Hollins.

## **NO ATTORNEY CLIENT RELATIONSHP IN THE BAR 5015 MATTER**

The Defendant attempts to hold Attorney Quinones-Hollins hostage by virtue of one incident in which he blindsided her with a phone call involving SA Brian Ritchie. This phone call neither created an explicit or implicit understanding nor a reasonable expectation of an attorney-client relationship in the mind of either party.

An attorney-client relationship arises by express agreement or by implication from the parties' actions. *See First National Bank of Durant v. Trans Terra Corps International*, 142 F.3d 802, 807 (5th Cir. 1998) (citing *Banc One Capital Partners v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995, which held that neither an express nor implied attorney-client relationship existed based on a single letter addressed to plaintiff and purporting to give an opinion solely for their benefit.)) "But whether the agreement is express or implied, there must be evidence *both* parties intended to create an attorney-client relationship—one party's subjective belief is insufficient to raise a question of fact to defeat summary judgment." *Belliveau v. Barco, Incorporated,* 987 F.3d 122, 133 (5th Cir. 2021) (quoting *Kiger v. Balestri*, 376 S.W.3d 287, 291 (Tex. App. – Dallas 2012, pet. denied)). Courts determine whether an attorney-client relationship can be implied using an objective standard, not an unstated subjective belief. *See id.* (citing *Span Enters v. Wood*, 272 S.W.3d 854, 858 (Tex. App.- Houston [1st Dist.] 2008, no pet.)).

Though unsure of the exact timeframe, Attorney Quinones-Hollins testified that the Defendant called her at some point in 2021 or 2022 and put her on the phone with SA Ritchie, who was sitting in a vehicle outside the Defendant's home. ECF No. 98, 14: 13–20. She also recalls

Attorney Robert Jones being a part of the phone call. Attorney Quinones-Hollins advised that prior to this phone call, the Defendant "knew that I wasn't going to represent him … for anything else" following the Defendant's failure to pay Attorney Quinones-Hollins over $20,000 after she defended him in a 2016 federal criminal tax fraud case and a 2021 state aggravated assault case. *Id.* 13:9–17.

During the phone call in 2021 or 2022, Attorney Quinones-Hollins did not discuss the Bar 5015 investigation with the Defendant or SA Ritchie and was only advised by SA Ritchie that he was getting a pattern of life on the Defendant. *Id.* 14:19-20. Thereafter, she never received a call from the Defendant about representing him in the Bar 5015 matter or any other matter. *Id.* 19:5–8. Attorney Quinones-Hollins further testified that she first became aware that the Defendant was a subject of the Bar 5015 arson when JLP began cooperating with Houston FBI agents in order to secure a favorable outcome in Mississippi. *Id.* 18:20–24. Consequently, neither an explicit nor implicit agreement was formed between the Defendant and Attorney Quinones-Hollins. In order for an agreement to be formed, whether explicit or implicit, both parties would, at a minimum, need to understand the nature of the representation. And to satisfy the standard set for in *Belliveau v. Barco, Incorporated*, both parties need to intend to enter into an attorney-client relationship. It is clear from the record that Attorney Quinones-Hollins did not know why SA Brian Ritchie was sitting outside the Defendant's home, that the Defendant never advised her about why he suspected SA Ritchie was there, and it is even clearer that she never intended to enter into an attorney-client relationship with him.

What is clear is that the Defendant's nonpayment of attorney fees to Attorney Quinones-Hollins severed their attorney client relationship as to all matters. A review of the Defendant's representation in legal matters after Attorney Quinones-Hollins' representation ended with the

2021 aggravated assault demonstrates that the Defendant understood that the "train had left the station" in terms of his ability to retain Attorney Quinones-Hollins.   Id. 15:18.

- April 2024:   Misdemeanor Assault
    - April 2024:   Appearance filed by *Attorney Robert Jones*
- May 2024:   Misdemeanor Harassment
    - June 2024:   Appearance filed by *Attorney Robert Jones*
    - August 2024:   Withdrawal filed by *Attorney Robert Jones*
    - November 2024:   Appearance filed by *Attorney Donale L. Evans*
- December 2024:   Liquor Violation
    - December 2024:   Appearance filed by *Attorney Donale L. Evans*

Encl. 4.

The Defendant's actions after his arrest in this case further reinforce his understanding that Attorney Quinones was not an option for him.   When cross examining SA Brian Ritchie at the hearing on this issue, Counsel for Defendant grossly inflated the Defendant's rear-view mention of Attorney Quinones-Hollins during his post-arrest interview and neglected to explore those statements and actions by the Defendant crystalizing his intent to be represented by Attorney Jones:

| | | |
|---|---|---|
| 25:25 | | Defendant asks his girlfriend, "Did you call Robert Jones?" |
| 26:30 | | Defendant responds "Yes" when his girlfriend asks if he wants her to call Attorney Carl Moore. |
| 26:42 | | Defendant states, "Robert can come to court with me, presentation-wise, Letitia, whoever, just whatever we gotta do.   Get Robert on the phone." |

| | |
|---|---|
| 28:15 | Defendant states, "Imma call Robert." |
| 1:29:20 | Defendant called Robert Jones' daughter. |
| 1:41:00 | Defendants tells his mother to call Robert Jones. |
| 1:50:00 | Defendant states, "I wanna make sure Robert is coming to court with me tomorrow." |
| 1:54:15 | In the presence of FBI agents, Defendant called Robert Jones and repeatedly stated, "I need you." |

On the day of his initial appearance, the Defendant again spoke to his mother and became frustrated when she told him Attorney Jones was not going to represent him. ECF. No. 98, 41:6-12.

On the contrary, during his post-arrest interview, the Defendant never called Attorney Quinones-Hollins or instructed his girlfriend or mother to call her as he did with Attorney Jones. Notably, the Defendant waived his rights and spoke to FBI agents without an attorney present. If as he alleges, Attorney Quinones-Hollins represents him in the Bar 5015 matter, it begs the question of why she wasn't his first, second, or last call.

Simply put, he could not afford her and did not have the means to pay what he owed her. Relatedly, the Defendant filed a financial affidavit in federal court claiming indigency and was provided his present CJA-appointed counsel. And despite his genuine pleadings, Attorney Jones is not representing him his matter. Notably, Attorney Jones was present in the courtroom as a spectator during the Defendant's detention hearing – presumably, Attorney Jones' train has also left the station for good.

## **NO GOVERNMENT INTERFERRENCE**

In his motion, Counsel for Defendant attempts to lay responsibility at the feet of the

Government. It is the Attorney Quinones-Hollins, however, who in the first instance, has a duty to screen for, recognize, and address conflicts of interest. *See* Tex. R. Prof'l Conduct 1.06 cmt. [17] ("Raising questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation."); ABA Model Rule 1.7 cmt. [3] ("To determine whether a conflict of interest exists, a lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practice, to determine in both litigation and non-litigation matters the persons and issues involved.").

The aforementioned rule in part recognizes that the government cannot research every defense attorney's client list to determine of there is a potential conflict of interest. In accordance with her professional obligations, Attorney Quinones-Hollins correctly brought the potential conflict issue to the attention of the government when she learned of the government's desire for JLP to provide information about the Defendant. Consistent with what Government Counsel advised this Court on the record, Attorney Quinones-Hollins spoke to Government Counsel about her prior representation of the Defendant in a 2016 federal criminal tax case. ECF No. 98, 9:19-25; 10:1-6. Because Attorney Quinones-Hollins was not privy to the full scope of the Bar 5015 investigation, her inquiry was necessary for her to assess whether she had confidential information about the Defendant that could limit her representation of JLP or that could violate her duty of loyalty to the Defendant. Government Counsel advised Attorney Quinones-Hollins that the two matters where completely unrelated and therefore there didn't appear to be a potential conflict of interest on that basis. Notably, these discussions took place during the investigative phase of the Bar 5015 (pre-indictment). Accordingly, Counsel for Defendant's assertions both on the record and in their motion that Attorney Quinones-Hollins and/or the government failed to seek judicial guidance is misguided.

It was not until after Counsel for Defendant raised the conflict of interest issue at the detention hearing that the government researched Attorney Quinones-Hollins prior representation of the Defendant in state level cases. Concurrently, the government informed Attorney Quinones-Hollins of Counsel for Defendant's allegation, at which time she and Attorney Moore decided to withdraw to ensure there was not even an appearance of a conflict. *Id.* 7:18-25; 8:1-2.

Counsel for Defendant further alleges that the U.S. Attorney's Office – Houston Division required JLP to testify against his will such that the Defendant received ineffective assistance of counsel. First, the Defendant did not have an established attorney-client relationship with Attorney Quinones-Hollins in the Bar 5015 matter. Second, Counsel for Defendant fails to appreciate that Attorney Quinones-Hollins represented JLP in a federal criminal matter in a separate federal district and that his cooperation as to all matters was a pre-condition of that federal district.

## **NO SIXTH AMENDMENT VIOLATION**

The Defendant continues to allege a Sixth Amendment violation despite evidence to the contrary at a hearing before this Court. The burden of proving a conflict of interest that requires disqualification is borne by the party seeking disqualification, which, in this case, is the Defendant. *Wheat v. United States*, 486 U.S. 153, 164 (1988). Analysis of attorney disqualification is guided "by state and national ethical standards adopted by the court." *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992).

The Sixth Amendment's guarantee of the right to counsel includes the "right to representation that is free from any conflict of interest." *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993). "A conflict exists when defense counsel places himself in a position conducive to divided loyalties." *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985). "This

question is highly fact-sensitive, and whether a conflict of interest exists depends on a number of factors, including, but not limited to, whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated." *United States v. Miranda*, No. 21-51156, 2025 WL 457317, at *3 (5th Cir. Feb. 11, 2025) (unpublished) (cleaned up); *United States v. Burns*, 526 F.3d 852, 857 (5th Cir. 2008) (rejecting conflict of interest claim because "The representation had been unequivocally terminated; the facts and issues of the previous representation had no relation to the charges brought against Burns. The attorney had very limited contact with the former client and in those contacts did not discuss the source of the forfeited funds.").

"Ultimately, there must be an actual conflict and not a speculative or potential conflict, and the defendant must show there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict." *Id.* (cleaned up); *see also United States v. Palacios*, 928 F.3d 450, 455 (5th Cir. 2019) ("An adverse effect may be established with evidence that some plausible alternative defense strategy or tactic could have been pursued, but was not because of the actual conflict impairing counsel's performance." (cleaned up)).

Conflicts of interest can arise in many contexts, although all share the same essential feature, which is the prospect that counsel may suffer some impairment that implicates the ability to give the client undivided loyalty and effort. Frequently, this impairment arises from counsel's efforts to represent multiple clients whose interests are not precisely identical. The most frequent conflicts of interest involve multiple representation, that is, the representation of more than one interest. Multiple representation may involve joint representation and/or **successive**

**representation**.

As to successive representation, which applies in the instant case, Rule 1.9 of the ABA Model Rules of Professional Responsibility provides that *"a lawyer who has formerly represented a client in a matter shall not thereafter represent another person **in the same or a substantially related matter in which that person's interests are materially adverse** to the interests of the former client unless the former client gives informed consent, confirmed in writing."* Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct mirrors this language.

The substantial relationship test embodied in this Rule has two elements: (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify, and (2) a 'substantial relationship' between the subject matter of the former and present representations. *In re Am. Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir. 1992).

In *Perillo v. Johnson*, 205 F.3d 775, 798 (5th Cir. 2000), the Fifth Circuit advised that a conflict may exist in a successive representation scenario when an attorney has confidential information that is helpful to one client but harmful to another. The *Perillo* court outlined several factors it considers in its analysis of actual conflicts when a successive representation is at issue: 1) the relationship between the subject matter of the multiple representations; 2) the temporal relationship between the prior and subsequent representation; and 3) the character and extent of the prior representation. Id. at 798-99. The Fifth Circuit also "relie[s] upon the 'substantial relationship' test when reviewing a former client's motion to disqualify counsel from pursuing successive and potentially adverse representation of another client in civil cases." *Id.* at 800 (citing *American Airlines*, 972 F.2d at 614–16).

Attorney Quinones-Hollins previously represented the Defendant in a 2005 arson case, a 2015 family member assault, a 2016 federal tax fraud case, and a 2021 aggravated assault case.

Applying Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct and the factors articulated in *Perillo*, it is clear that no actual conflict exists in Attorney Quinones-Hollins representation of JLP in the instant case. The Defendant's prior cases are not substantially related to the current matter. The subject matter is different, there are no common defendants or witnesses, and Attorney Quinones last represented the Defendant three years before learning that the Defendant was a suspect in the federal arson investigation.

  Counsel for Defendant seems to be arguing under a theory of simultaneous representation, but they cannot establish an attorney-client relationship through either an explicit or implicit agreement or the objective actions of Attorney Quinones-Hollins and the Defendant. Furthermore, the cases they rely on in their supplemental briefing analyze conflicts of interest in the context of trial attorneys who represented multiple parties in the same trial (e.g. a trial attorney who presently represents the defendant - while also having represented co-defendants who pled guilty and were testifying at the defendant's trial). In the cases cited by Counsel for the Defendant, the Circuit Court was analyzing an alleged conflict of interest after a trial and conviction. Relying on the Counsel for Defendant's caselaw, a completed trial is the proper framework upon which a Court may determine whether a conflict of interest adversely affected an attorney's performance such that a client was denied effective assistance of counsel. In the context of the present case, that could happen if the government learned confidential information about the Defendant [and we have not] from Attorney Quinones-Hollins and used that information against him at a trial. Conversely, if Attorney Quinones did possess confidential information about the Defendant that could assist the government in its prosecution of the Defendant, her inability to share that information, due to her duty of loyalty to a former client, limits her ability to zealously advocate for JLP. In either case, assuming such a conundrum existed, the appropriate remedy,

prior to a trial, is disqualification of the attorney.  Counsel for the Defendant continues to put the cart before the horse in asking to dismiss the indictment or suppress evidence.

Counsel for the Defendant is asking to dismiss an indictment or suppress information provided by JLP without providing any authority or basis.  Counsel for Defendant relied on *United States v. Stein* in arguing that "[c]ontrary to the Government's contentions, the Court is in a position to detect and remedy the Sixth Amendment violation before trial."  *United States v. Stein*, 435 F.Supp 330 (S.D.N.Y. June 26, 2006).  *Stein*, however, was not a case concerning attorney conflicts of interest.  In *Stein*, the Court, finding a due process violation, dismissed an indictment because the United States Attorney's Office threatened to indict an employer if that employer paid the attorney fees of culpable employees.  Id. at 382.

Neither has Counsel for Defendant provided any authority to suppress evidence in this case. It is inescapable that no constitutional right of JLP was violated in obtaining information that established a basis to indict the Defendant, and even if it was, the Defendant cannot assert JLP's rights.  JLP provided information to the government in order to benefit himself in a proceeding in another federal district, not because of any confidential information provided by the Defendant's former counsel, Attorney Quinones-Hollins.  At this stage of the proceedings, assuming an actual conflict did exist, the appropriate remedy would be disqualification of JLP's present defense counsel.  However, because Attorney Quinones-Hollins and Attorney Moore have indicated a desire to withdraw to avoid any appearance of a conflict, this Court need not go that far.

## NO DUE PROCESS VIOLATION

It is Counsel for Defendant's burden to prove the conflict of interest, yet his motion is replete with generalized, unsupported assertions and accusations against the Government.

Counsel for Defendant first incorrectly presumes that SA Ritchie interviewed Ms. Nakia

Price despite knowing she was represented by Attorney Robert Jones. This in incorrect. While Ms. Price was represented by Attorney Jones during an interview in the direct aftermath of the Bar 5015 arson in 2020, as reflected in the FBI-302 interview summary provided to Counsel for Defendant, she was represented by a different lawyer when SA Ritchie first interviewed her in 2024. See Encl. 5. Notably, the Defendant was unable to control and manipulate her choice of counsel in the same manner he did his "*ranch hands*" because their marriage was in dissolution.

At the hearing on this issue, Counsel for Defendant introduced a text from the Defendant to Ms. Nakia Price as evidence that Ms. Price and SA Ritchie understood that Attorney Quinones-Hollins was representing the Defendant. The text, however, contains the self-serving, desperate, agenda driven words of a Defendant who believed Ms. Price was cooperating with the government. This same desperation was apparent during his post-arrest interview when he tried to direct FBI agents to look into Ms. Nakia Price and when he disclaimed any "beef" with the victim, Steve Rogers, and offered to agents that Ms. Price had "beef" with Steve Rogers. Encl. 1, 42:30; 44:30. Importantly, in the above-mentioned text, the Defendant refers back to the blindsided phone call he manipulated Attorney Quinones-Hollins into having with SA Ritchie at a time when he knew she was not going to (and did not) represent him in future legal proceedings. As argued previously in this motion, this encounter did not establish an explicit or implicit agreement in the mind of either the Defendant or Attorney Quinones-Hollins.

In support of their argument of due process violations, Counsel for the Defendant alleges, on multiple occasions, that the government elicited privileged information from Attorney Quinones-Hollins and that Attorney Quinones-Hollins ultimately disclosed privileged communications to the government. What Counsel for the Defendant conspicuously fails to provide is the content of these privileged communications. Counsel for Defendant had an

opportunity to examine Attorney Quinones-Hollins about any privileged information she disclosed to the government, and she responded by saying, 1) "Mr. Edwards never asked me about any conversations that Mr. Lyndell Price and I have had"; 2) " … when I explained to Mr. Edwards that Mr. Lyndell Price's and my relationship was no more, Mr. Edwards told me – and I agreed – 'Don't even tell me why.'"; 3) "I even explained to him [Mr. Edwards] that there was a potential text message between Mr. Lyndell Price and I.  He didn't want to know what the substance was …"; and 4) "I have never once shared with Mr. Edwards anything in confidence that Mr. Lyndell Price told me."   ECF No. 98, 26:21-25; 27:1-11.   Relatedly, in response to another question from Counsel for the Defendant, Attorney Quinones remarked, "Because I never represented Lyndell Price on the [2016 federal] arson case, I, too, felt that there was not a conflict because I didn't have any secrets as it pertained to the substantial matter for which Mr. Lyndell Price was being prosecuted."   Id. 26:8–11.

Inexplicably, Counsel for the Defendant, even after hearing the testimony of Attorney Quinones-Hollins, still maintained in their motion that the government obtained confidential information about the Defendant that was used to his detriment and for the benefit of JLP.  As with the other prongs of their argument, they again fail to provide evidence.  The information used to the Defendant's detriment was garnered as a pre-condition of JLP's cooperation in another federal district.

## NO STRICKLAND VIOLATION

Counsel for Defendant lastly alleges a *Strickland* violation, again relying on legal precedent in which the court evaluates prejudice in the context of a defendant's rights at trial. Their argument as to this issue is premature and should therefore be disregarded.

## **CONCLUSION**

The Defendant manipulated his "*ranch hands*" into committing arson on his behalf. He manipulated their choice of counsel in an attempt to maintain control of the information they provided. He manipulated attorneys in order to keep tabs on those in his criminal sphere and to attempt to keep the FBI off his back. And now he attempts to manipulate facts and rules surrounding the attorney client privilege to defeat his indictment. This Court should not let the inmate run the asylum.

For all the foregoing reasons, the Government respectfully requests that this Court deny the Defendant's motion to dismiss the present indictment or suppress evidence derived from JLP.

        Respectfully submitted,

        NICHOLAS J. GANJEI
        United States Attorney
        Southern District of Texas

By:   */s/Sebastian A. Edwards*
       Sebastian A. Edwards
       Keri Fuller
       Assistant United States Attorneys
       1000 Louisiana Street, 24th Floor
       Houston, Texas 77002
       Tel.: (713) 567-9503; FAX: (713) 718-33

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served via ECF to counsel for Defendant.

/s/ Sebastian A. Edwards
Sebastian A. Edwards
