IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

UNITED STATES OF AMERICA 4:24-cr-0565-1

VS. May 1, 2025
Houston, Texas
10:05 a.m.

LYNDELL LEROY PRICE

ARRAIGNMENT AND DETENTION HEARING

BEFORE THE HONORABLE DENA H. PALERMO

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States: Sebastian A. Edwards, AUSA
Keri L. Fuller, AUSA
U. S. Attorney's Office
1000 Louisiana Street
Suite 2300
Houston, Texas 77002

For Defendant: Chukwudi I. Egbuonu
Attorney at Law
2202 Ruth Street
Houston, Texas 77004

Darryl E. Austin, AFPD
Office of the Federal Public Defender
440 Louisiana
Suite 1350
Houston, Texas 77002

Case Manager: Carol Felchak

Proceedings from official electronic sound recording; transcript produced by court approved transcriber.

Electronic Recording Operator Amy Pearson

Also Present Karen Barrientos, USPTO
U. S. Pretrial Office

# INDEX


| | Pages |
|---|---|
| **WITNESSES FOR THE GOVERNMENT:** | |
| Agent Deborah Renee Cline | |
| Direct Examination by Mr. Edwards | 17 |
| Cross Examination by Mr. Egbuonu | 57 |
| **WITNESSES FOR THE DEFENSE:** | |
| Leon Kenloch | |
| Direct Examination by Mr. Egbuonu | 91 |
| Proffers | |
| Michael Saldano | 96 |
| Shirley Price | 97 |

EXHIBITS:

| | | Offered | Admitted |
|---|---|---|---|
| G-1 | screenshot | 17 | 29 |
| G-2 | photo | 29 | 35 |
| G-3 | photo | 29 | 35 |
| G-4 | text message | 35 | 49 |
| G-5 | text message | 42 | 49 |
| D-1 | letter | 94 | 94 |
| D-2 | photo | 94 | 94 |
| D-3 | photo | 94 | 94 |
| D-4 | photo | 94 | 94 |
| D-5 | photo | 94 | 94 |

ARGUMENTS:

| | |
|---|---|
| By Mr. Edwards | 99 |
| By Mr. Egbuonu | 105 |

THE COURT: Please be seated, everyone.

All right.

Call the United States of America – oh, that's the wrong case, Carol. This says –

CASE MANAGER: Oh, I don't – just close that. We don't need the Scheduling Order on that one.

THE COURT: Yeah. But aren't we going to do the Arraignment?

CASE MANAGER: This is the right one?

THE COURT: Yeah. This is the right one, but it says Arraignment also.

It's Arraignment also on this, correct?

(Discussion held off the record.)

THE COURT: All right.

Call the United States of America versus Lyndell Leroy Price, Case No. 4:24-cr-565.

Can I have the appearances of counsel?

MR. ALEXANDER: Good morning, Your Honor; Sebastian Edwards and Kerry Fuller for the United States.

MR. EGBUONU: Good morning, Your Honor; Chuck Egbuonu for Mr. Price, and I'm joined by – at counsel table by – with Darryl Austin.

THE COURT: Okay.

We need to do the Arraignment, so let's do that first.

You want to bring up Mr. Price?

Okay.

On the Arraignment, do you waive formal reading of the charges?

MR. EGBUONU: We do, Your Honor.

THE COURT: Okay.

So, Mr. Price, you have a copy of the Superseding Indictment, correct?

DEFENDANT PRICE: Yes, ma'am.

THE COURT: And you've had a chance to review the charges against you with your attorney?

DEFENDANT PRICE: Yes, ma'am.

THE COURT: And you understand the charges that have been brought against you?

DEFENDANT PRICE: Yes, ma'am.

THE COURT: How do you plead to the Superseding Indictment? Guilty or not guilty?

DEFENDANT PRICE: Not guilty.

THE COURT: Not guilty.

Okay. Mr. Edwards, is there new charges against Mr. Price in this Indictment that weren't in the prior Indictment, or is he charged for the first time in this Indictment?

MR. EDWARDS: For the first time in this Indictment, Your Honor.

THE COURT: Okay.

All right.

So, a not guilty plea has been entered on your behalf.

Carol's preparing the Scheduling Order.

CASE MANAGER: Oh, I'll have a copy in the Indictment.

THE COURT: Oh, who's the judge?

CASE MANAGER: Judge Lake.

THE COURT: Judge Lake?

MR. EGBUONU: Yes, Your Honor.

THE COURT: Okay.

So, the – you can get the Scheduling Order – it's already entered in the case, because we did this for somebody else.

CASE MANAGER: I'm frozen – not working.

THE COURT: Yeah. You're not working. Okay.

You'll be able to get it off of the standard ECF.

MR. EGBUONU: Yes, Your Honor.

THE COURT: Okay.

You can go back and sit down.

DEFENDANT PRICE: Yes, ma'am.

THE COURT: Thank you.

All right.

So, turning to the Detention Hearing, is the Government ready to go forward?

MR. EDWARDS: Yes, Your Honor.

THE COURT: You can call your first witness.

MR. EDWARDS: Yes, Your Honor.

The Government calls Agent, Special Agent Deborah Renee Cline.

MR. EGBUONU: Your Honor, as a preliminary matter, before we start with the Detention Hearing, it is our understanding based on the representation that the Government made at the Initial Appearance is that they're moving for detention on the premise that Mr. Price is a danger to the community.

It's our position that this – the charges that he's currently charged with is not a crime of violence, is not one of the crimes listed in 3142 as a crime of violence, and therefore, we would argue that the Government is not entitled to the Detention Hearing on those – on that basis of danger to the community.

THE COURT: Mr. Edwards?

MR. EDWARDS: Your Honor, it's just if Defense counsel could more articulate that answer –

MR. EGBUONU: Well, yeah.

MR. EDWARDS: One of the factors that the Judge is allowed to consider are flight risk and danger to the

community -

THE COURT: In order to do that, I have to qualify it for a Detention Hearing; it has to meet - on the danger theory, it has to meet one of the listed crimes in that specific statutory provision. So, like, for example, drug cases, typically fall under that. I mean - let me pull up 38- --

MR. EGBUONU: That - and, Your Honor, just to be clear, the Government did not move on flight risk. They only moved on a danger to the community, and it is our position that the crime that the Government has charged Mr. Price with is not one of those enumerated crimes under the statute, which entitles them to a Detention Hearing.

So, it is our position that -

THE COURT: Okay. So, tell me which statutory - the sub provision it is.

MR. EGBUONU: So, we're looking at 3142(f)(1).

THE COURT: Okay, (f)(1).

Okay. I'm having a hard time reading, because my eyes are still dilated, and so -

MR. EGBUONU: So, again, (1)(a) says, states a crime of violence, a violation of 1591 or an offense listed in Section 2332(b)(G)(5) - or excuse me, subsection G, subsection (5), subsection (b). It's our position that the crime that he's been charged with does not fall within that perimeter is

not an offense for which a maximum sentence is life imprisonment or death. So, that wouldn't entitle the Government to a Detention Hearing.

Additionally, (c), an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substance Act. Arson wasn't involved within that category. Any felony in which - and such person have been convicted of two or more offenses as described in subsection (a) through (c), again, that would - this case wouldn't qualify.

And (e), any felony that is not otherwise a crime of violence that involves a minor victim or involves the possession or use of a firearm or other destructive device or any other dangerous weapon involves a fail- -- or involves a failure to register under Section 2250 of Title 18, United States Code.

Again, we argue that this case would fall under that subsection item.

So - and again, just briefly, since this does not fall within, you know, it defines entitlement under statutes our position that the Court then would set a release with conditions that the Court feels is appropriate based on the introduction of facts and things of that nature, but there shouldn't be a Detention Hearing.

THE COURT: So, in other words, it's your position

that we could go forward with the hearing on the basis of me determining what factors are necessary for the bond?

MR. EGBUONU: Well, we shouldn't have a Detention Hearing at all. I think that the Court can - through its wisdom look at the Pretrial Services Report and determine - determine factors that the Court would be comfortable with setting bond, but it - there should not be a Detention Hearing is our position, and he should be released is our position based on the statute.

THE COURT: Okay.

Mr. Edwards, do you need a moment to - to respond?

MR. EDWARDS: Your Honor, I would like a moment.

I would say that - that we go forward with this hearing - with this hearing and you find that there's no - no conditions that would assure the Defendant's, you know, presence at court or - or safety to the community, I believe that you can still order the detention of this Defendant.

Your Honor, I would also argue -

THE COURT: But I'm not sure, Mr. Edwards - I'm not sure if we can have a Detention Hearing in the first instance. Okay? Because in order to have a Detention Hearing, as I understand the law, in my wisdom - that's the first time anybody ever said that. We might need to get a copy of the transcript there.

MR. EGBUONU: Print it out, Your Honor.

THE COURT: That, you know, it's under one of two provisions. It's either under - and I can't read the numbers, but it's (f)(1), which lists those specific statutory requirements or it's under (f)(2) and at the Detention - and at the initial - and I don't remember specifically and I don't have my notes in front of me from that hearing - but at that hearing Mr. Egbuonu -

MR. EGBUONU: Yes, Your Honor.

THE COURT: -- says that it was on the basis of danger only. And in order for it to be a serious risk of flight, even if you had made that argument, you know, you would have to say what the serious risk of flight is. But - and I think that a serious risk of flight can be proved at the Detention Hearing, and I don't agree with the FPD's position, whereas they have to make a full factual statement at the Initial Appearance stage, and all the other Magistrate Judges agree with me on that point, I think.

But - but if we're going on danger, then it has to qualify for danger under one of those provisions, and I don't know that arson doesn't fall under it -

MR. EGBUONU: Yeah.

THE COURT: -- but if these charges don't fall under it, then you don't come within the ambit of the danger prong.

Yes, under the (g) factors I am allowed to

consider danger to the community, but that's only once you're already at a Detention Hearing. So, once we are having a Detention Hearing, I consider all the (g) factors to determine whether or not I'm going to release or not release. But we don't even get to the (g) factors if we don't have the basis for having a Detention Hearing.

MR. EDWARDS: Your Honor, I –

THE COURT: So, this is what I'm going to do.

MR. EDWARDS: Your Honor, if I may, under (f)(2)(B), and then, Your Honor, if Defense counsel wants to hold me, so –

MR. EGBUONU: No, no, no.

MR. EDWARDS: So, Your Honor.

THE COURT: Hold on. Hold on.

Go ahead, Mr. Edwards.

I'm listening to you.

MR. EDWARDS: Upon a motion of the Government, you may hold if the hearing if we argue – if we're arguing that there's a serious risk of the person will obstruct or attempt to obstruct justice, threaten, injure or intimidate – intimidate or attempt to threaten, injure or intimidate a perspective juror or witness. So, we would like to move under that ground as well, Your Honor.

THE COURT: Okay.

MR. EDWARDS: And we will present evidence –

THE COURT: Of those facts.

MR. EDWARDS: -- as to that fact. Yes, Your Honor.

THE COURT: Okay.

MR. EGBUONU: And, Your Honor – and I think the Court has touched upon it briefly as it relates to – if the Government has articulated the basis and the factual basis as it relates to moving under (f)(2).

The Government in open court made their motion. They stated that they're moving under danger to the community and this bond does not fall under that. And now, the Government is trying to now pivot and say that they're moving under (f)(2). And again, it's not a danger to the community analysis. It's more of a serious risk and the statute states; it's a serious risk that such person will obstruct or attempt to obstruct justice or further injure or intimidate or attempt to further injure or intimidate a perspective witness or juror.

So, again, that has nothing to do with danger to the community. That is very narrowly tailored as it relates to obstruction by intimidating a witness, intimidating a potential juror, not a danger to the community.

THE COURT: Okay. So, he's – what he's doing, as I understand it, is moving to – to have a Detention Hearing under the (f)(2) provision as opposed to under the (f)(1) provision, and there's no reason not to allow him to do that.

I understand what you're saying, and I agree with you if it doesn't come within one of those statutory requirements, then he doesn't - the Government's not entitled to have a Detention Hearing. But if he can establish the (f)(2) requirement, I'm not going to say, we're not going to have a Detention Hearing just because whoever was the duty attorney at the hearing on the Initial didn't say the right magic words.

MR. EGBUONU: Well, it wasn't the duty attorney; it was Mr. Edwards.

MR. EDWARDS: And so -

THE COURT: Was Mr. Edwards there?

MR. EGBUONU: Mr. Edwards was here. He's the one that moved under danger to the community. It was not one of his colleagues. So, again, now he's trying to circumvent what he has already moved for. So, now, I'll try to pivot - because he's not entitled to a Detention Hearing based on his own motion, which he made at the Initial conference.

MR. EDWARDS: Your Honor, it - if - the Government's position is that there's a threat that this witness will injure, obstruct, threaten perspective Government witnesses - I mean, I understand that the Defense counsel thinks that's a pivot, but that's subsumed within a danger to the community as well.

They are the community. The witnesses that will

come forth to testify in this case are part of the community as well.

THE COURT: Yeah, but that's under a (g) factor. That's not under the (f)(1) factor. For the (f)(1) factor of danger to the community, you have to be one of those provisions.

But here was what I'm going to say. You were at that hearing also. You didn't object to the Detention Hearing at the Initial on the basis of if it doesn't come under – under the (f)(1) factors, and he now wants to bring it under the (f)(2) factors. I'm going to allow the hearing to go forward.

MR. EGBUONU: Yes, Your Honor.

THE COURT: Good argument. Well done. But we're going to go forward on the (f)(2).

MR. EGBUONU: Thank you, Your Honor.

THE COURT: You're welcome.

All right. Now, you can call your –

I'm sorry?

MR. EGBUONU: One last – one clarification, Your Honor.

THE COURT: Okay.

MR. EGBUONU: It was my understanding –

MR. EDWARD: Excuse me, Your Honor.

MR. EGBUONU: But it is my understanding that the

Court stated that the Government must articulate the basis, the factual basis as to why they're moving under (f)(2) now if that's what they're going to have to remove it under, what are the factual basis that support that move - that - their movement for a Detention Hearing under that basis. I think we're entitled to know that information.

THE COURT: That's what the hearing is for. Their - the Gov- -- you know, FPD makes this argument at Initial Appearances often that, oh, when it's a serious risk of flight I want to know what the factual basis is for serious risk of flight. I am not requiring a statement - I mean, he can state it right now, but I'm not requiring that as the statement to go forward on an (f)(2) basis.

MR. EGBUONU: Okay.

THE COURT: You know, we go forward. We have - that is the purpose of the Detention Hearing.

MR. EGBUONU: Yes, Your Honor.

THE COURT: Is to figure out what the facts are, and then I make the decision based on all the evidence that's presented to me, whether I think that there are conditions that I can formulate that would allow for his appearance and safety to the community, and safety to the community is a due factor. And if not, then I detain.

MR. EGBUONU: Okay.

THE COURT: Okay?

MR. EGBUONU: Yes, Your Honor.

THE COURT: Thank you.

All right.

Mr. Edwards, you can now call your first witness.

MR. EDWARDS: Thank you, Your Honor.

Your Honor, the Government calls Agent Deborah Renee Cline.

THE COURT: I'm sorry. I didn't hear the last name.

MR. EDWARDS: Cline, Your Honor; Deborah Renee Cline.

(Witness sworn.)

THE WITNESS: Yes, I do.

MR. EDWARDS: Your Honor, may I conduct Direct from my seat?

THE COURT: You may.

But you know what? You need – maybe sit in that seat so that you're looking at her instead of turning and put that microphone right to your face.

MR. EDWARDS: Yes, Your Honor.

THE COURT: So that the Court Reporter can hear what you're saying for the record.

AGENT DEBORAH RENEE CLINE, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. EDWARDS:

Q All right. Agent Cline, could you please state your name

for the record; spell your last name?
A Yes. My name is Deborah Renee Cline, last name, C-L-I-N-E.
Q And you've been an FBI agent for - since 2008; is that correct?
A Yes, since May of 2008.
Q All right.
Your Honor, I'm going to zoom through factually the - the facts of the case. This case has - had been before a grand jury. It's been indicted on probable cause, so I'm going to lead the witness a little bit to speed through this, so we get through this hearing within - within an hour of time.
THE COURT: Okay.
BY MR. EDWARDS:
Q Agent Cline, I'm going to hand you what's been marked as Government's Exhibit 1.
Agent Cline, what you're looking at right now is a - a screenshot of the security camera footage from the 5015 Bar; is that correct?
A Yes.
Q And this was captured at - on June 12th, 2020, at 4:44 a.m., correct?
A Correct.
Q The individual who appears to be holding the fire source,

who is that individual?
A That is John Lee Price.
Q Okay.
THE COURT: Okay. Wait, wait. I'm sorry.
Which one is the fire source? I can't tell.
MR. EDWARDS: The individual that appears to be – I'm sorry – from left to right in the photo, the second individual that appears from left to right –
THE COURT: Is that in the middle?
MR. EWARDS: -- is John Lee Price.
THE COURT: The one in the middle?
MR. EDWARDS: Your Honor –
THE COURT: Pick the –
MR. EDWARDS: -- there are actually four individuals in this photo.
THE COURT: Okay. So, can you point to which one I'm –
THE WITNESS: Yes, ma'am.
THE COURT: -- supposed to be looking at?
THE WITNESS: That one right there.
THE COURT: That guy.
THE WITNESS: Yes, ma'am.
THE COURT: The one that's lit up. Okay.
THE WITNESS: Yes, ma'am.
THE COURT: Okay. Got it.

BY MR. EDWARDS:
Q That - that's John Lee Price, correct, Agent Cline?
A Correct.
Q All right.
And he became a primary suspect in this investigation after Geo prints data showed that his phone was active within 22 meters of Bar 5015; is that correct?
A That's correct.
Q Bar 5015 is owned by Steve Rodgers, a gentleman by the name of Steve Rodgers, right?
A Yes.
Q And he was also a part owner of the Turkey Leg Hut; is that correct?
A Yes.
Q And the Defendant is also a de facto owner of the Turkey Leg Hut or was a de facto owner before it went into bankruptcy; is that right?
A Yes.
Q He - a de factor owner because he has a federal conviction and because of that couldn't been on the paperwork associated with the restaurant?
A Correct.
Q That bar is also co-owned by his wife and others; is that right?
A Correct.

Q Okay.

So, in addition to the Geo prints data, Investigators received historical cell site analysis that showed that John Lee Price - Price's phone was pinging on towers around the Turkey Leg Hut at the time of the arson; is that correct?

A Yes.

Q You also obtained call detail records that show calls between John Lee Price and the Defendant; is that right?

A Yes.

Q And - and how did those call detail records make the Defendant a primary suspect?

A The calls were made a few minutes prior to the fire and after the fire.

Q Okay.

And to be more specific, if this arson - it appears that they're - they're lighting a fire source at 4:44 a.m. At 4:47 a.m., John Lee Price calls Lynn Price; is that correct?

A That is correct.

Q And he called him again at 5:47 a.m. that morning; is that right?

A Yes. That's correct.

THE COURT: Say it again now.

John Lee called at what time?

MR. EDWARDS: Called at 4:47 a.m.; is that right, Agent Cline?

THE WITNESS: Yes.

BY MR. EDWARDS:

Q And he called again at 5:47 a.m., correct?

A Yes.

Q Now, Mr. - Mr. Price - John Lee Price was - and I will say about the call detail records they also showed that - that during the month of June there are no - no other calls between John Lee Price and the Defendant, between the hours of 1:00 a.m. and 8:00 a.m.; is that correct?

A That is correct.

Q Okay.

I want to fast forward to 2023. John Lee Price was arrested and later indicted on federal drug trafficking charges in Mississippi; is that correct?

A That is correct.

Q You and your partner went to interview him in Mississippi?

A Yes, we did.

Q And at that time he identified himself as the individual in this photo that is Government Exhibit 1.

A Yes, he did.

Q He also identified other individuals in this photo; is that correct?

A That is correct.

Q And he confessed to his role and the role of everyone involved?
A Yes, he did.
Q As a result of that interview, did you then interview a gentleman named Armani Williams who was in this photo standing to the right of John Lee Price?
A Yes, we did.
Q And what did he indicate to you?
A Mr. Williams stated that he was involved in the fire at Bar 5015.
Q So - so, he confessed.
A He did.
Q Okay.
Did you also interview - it's hard to see, but on the very right edge of this photo is a gentleman involved. Were you able to identify him?
A Yes, we did.
Q Okay. And did you interview him?
A We did. We identified him as Masia Shepherd (phonetic), and we interviewed him.
Q Okay. And did he admit to his involvement?
A No, he did not.
Q Did you find call detail records showing that he was talking to Armani Williams in the early hours of June 12th, around the time of the fire?

A Yes, we did.
Q All right.
Now, you indicated that – that John Lee Price talked about his role and the role of others. Is it correct that he told you that the Defendant directed him to find a crew to set fire to Bar 5015?
A Yes, he did.
Q And the Defendant told him something to the effect of "I'll take care of you," meaning he was going to pay him?
A Yes.
Q And is it correct that John Lee Price walked you through pre-fire, during the fire, post fire – all of the actions of him, the Defendant and the others involved?
A Yes, he did.
Q And he indicated that he was paid the same day of the fire by the Defendant at the Turkey Leg Hut; is that correct?
A That is correct.
Q How many payments did he say he received?
A He received two.
Q And what did he do with those – those payments?
A The first payment a $1000 he gave to the crew – Armani, Williams, and then, he – he received a second payment for approximately $400.
Q Did he explain – so, we talked earlier about a phone call three minutes after – about three minutes after the fire that

he made to the Defendant. Did he describe what happened during that call?

A He did. He said he called the Defendant, and the Defendant said, "I've already heard," referring to the fire, and that they would meet up later on at the Turkey Leg Hut.

Q Okay. And you - I'm going to go back your interview of Armani Williams.

During your interview of Armani Williams, did he - did he express any fear about talking to law enforcement?

A He did.

Q And can you talk about that?

A He was scared. He had previously worked for Turkey Leg Hut, so after we - after the fire and he was paid, he just feared retribution for - because of it was from the Turkey Leg Hut.

Q And did he go into any specifics on who he feared retribution from in talking to us?

A The Defendant Lynn Price.

Q And did he - did he give you a basis for why he - he felt fear or felt that retribution could occur?

A He just said that he had a reputation - Lynn Price had a reputation; he had worked with him before and that he knew that - of his violence.

Q Okay. I guess turning back to the call that John Lee Price made to the Defendant.

Did he describe what the Defendant said during that phone call? Or have you - have - did you tell us that already?
A The phone call he - I did. I said that when he called Lynn Price Lynn Price said he had already heard -
Q Okay.
A -- regarding the fire.
Q All right.
Did you interview Steve Rodgers, the victim, the owner of Bar 5015?
A Yes, we did.
Q And is it correct that Mr. - in terms of establishing a motive for the fire, was Mr. Rodgers helpful in understanding what led up to the fire?
A Yes, he was.
Q All right.
Is it correct that he indicated that he was also a co-owner of - co-owner of the Turkey Leg Hut, and he had this idea to open up Bar 5015 in the 2019, 2020 timeframe?
A Yes.
Q And initially, he said he was going to bring Mr. Lynn Price in on the business with him; is that correct?
A That’s correct.
Q And - and what did he say happened such that that didn’t - didn’t occur?

A He – he decided that he didn't want Lynn or Nikia Price (phonetic) part of it. They had kind of had some problems with the Turkey Leg Hut and some lawsuits were being filed, and so, he decided he didn't want them to be a part of the bar.
Q Okay.
Did he talk about an attempt from the Defendant to buy into the Bar 5015?
A Yes, he did.
Q And what about that?
A He said that the Defendant Lynn Price came to the bar with a box full of cash, and as a payment to be part of the partnership within the bar, Mr. Rodgers then took the box back to the Turkey Leg Hut and returned the money.
Q Okay.
Did he also talk about a phone call that he received from the Defendant pre- -- pre-fire – did he talk about a phone call he received from the Defendant pre- -- pre-fire?
A Yes, he did.
Q And during that phone call, is it correct that he said that the Defendant called yelling and hollering about – about Mr. Rodgers selling crawfish at –
MR. EGBUONU: Your Honor, I'm going to object to leading. The Prosecutor is testifying.

THE COURT: Well, this is a Detention Hearing.

MR. EGBUONU: I can understand the last nature, but he's testifying.

MR. EDWARDS: Your Honor, we have a lot of material to get through, and we're trying to get through the material. And Your Honor, I will tell you that -

THE COURT: You can lead. That's fine.

That's fine.

MR. EDWARDS: Thank you, Your Honor.

BY MR. EDWARDS:

Q Is It correct that he - he indicated that Mr. Lynn Price called yelling at him on the phone about the sale of crawfish at Bar 5015?

A Yes.

Q He was upset because they - they were using the same supply area, and viewed it as a conflict of interest?

A Yes.

Q And what else did Mr. Rodgers tell you about that phone call?

A He said that he had been hearing that the bartenders of 5015 were talking about him and his wife, and he said that he needed - that Mr. Rodgers needed to put a stop to it, and yelled that he was going to blow his place up.

Q Okay.

So, Mr. Rodgers indicated that at that time

Mr. Price - Lynn Price said he was going to blow up - he was going to blow his place up if -

A Yes.

Q Okay.

If these conditions weren't met?

A Correct.

Q I'm going to hand you what's been marked as Government Exhibit No. 2 and 3.

THE COURT: Did you move to enter Government's Exhibit 1?

MR. EDWARDS: I did not, Your Honor.

Your Honor, the Government moves to Ex- --, I'm sorry - moves to admit Government's Exhibit 1.

THE COURT: Any objection?

MR. EGBUONU: No objection, Your Honor.

THE COURT: Okay.

So admitted.

(Government's Exhibit No. 1 admitted.)

THE COURT: All right.

Which ones - 2?

MR. EDWARDS: 2 and 3, Your Honor.

THE COURT: Yeah, but which ones - 2 out of these both?

MR. EDWARDS: I'm sorry, Your Honor.

The color photo is 2.

THE COURT: Okay.

MR. EDWARDS: And the non-color photo is 3.

BY MR. EDWARDS:

Q Agent Cline, these are photos that Mr. Rodgers provided from his phone; is that correct?

A That's correct.

Q And he indicated that these messages were sent to him from the Defendant?

A Yes.

Q And he - he viewed these messages as - as threatening messages from the Defendant?

A Yes, he did.

Q Okay.

Did you - did you speak with any other - the other individuals connected with the Turkey Leg Hut -

THE COURT: I'm sorry.

Can you have her read this one, because I can't read it.

MR. EDWARDS: I will, Your Honor.

BY MR. EDWARDS:

Q Agent Cline, would you please read from - first from Government Exhibit 2 the reply message from the Defendant to Steve Rodgers?

THE COURT: Which one is the - which one is the first message, and which one is the reply message?

BY MR. EDWARDS:
Q Agent Cline, the – the blue box would be con- -- is this the message sent from the Defendant to Mr. Rodgers; is that correct?
A That's correct.
Q All right.
Could you please read that?
A Okay.
"Nigger, you don't have to pick the phone up at all. Let you bitch asses bartenders, all four of them niggers, know to keep my name out of their mouth. And I meant it before. They don't have no (expletive) job talking about we mad at you for selling crawfish.
Nigger, you got the game messed up. You're for real, but your scary ass ain't got to pick up at all. But let your bartenders know they got me messed up."
Q Agent Cline, it's okay if you say the word "fuck."
A Okay.
Q We want you to –
A Yeah, okay. Well, yeah, that's what he said.
Q -- to communicate exactly what the Defendant says.
A Yeah, okay.
THE COURT: So, the word – the word is an expletive.
THE WITNESS: Yes.

THE COURT: You don't want to say it. I get it. That's fine. I - I hear - I hear the message.

Mr. Egbuonu, do you want her to read it exactly as written?

MR. EGBUONU: No, No, I'll - no, Your Honor. I was just confused as to why she could say the "N" word but not say "F."

THE WITNESS: Well, I don't really want to say the "N" word.

MR. EGBUONU: Okay. Well - I was just - that's what my point of confusion was, Your Honor. I apologize.

THE COURT: I got it. I hear you.

Okay. So, now?

MR. EDWARDS: And, Your Honor, are you able to see the second Exhibit 3, or should we have --

THE COURT: Yeah, that - that I can read.

And who is this from?

It says, "Lynn Real Deal Price" up top.

Does that mean that that's who it's from?

MR. EDWARDS: That's correct, Your Honor.

According to the -

BY MR. EDWARDS:

Q Agent Cline, according to the witness, Mr. Rodgers, this message was from Lynn Price to him; is that correct?

A To Steve Rodgers, yes.

Q And did you - did you speak with any other individuals connected with the Turkey Leg Hut who indicated they received a threatening message from the Defendant?
A I did.
Q Who was that individual?
A It was a former General Manager of Turkey Leg Hut.
Q Okay.
I'm going to show you what's -
Your Honor, the Government moves to exhi- -- I'm sorry - moves to admit Exhibits 2 and 3.
THE COURT: Any objection?
MR. EGBUONU: Your Honor, as - is this 2 or 3?
THE COURT: That's 3.
MR. EDWARDS: That's 3.
MR. EGBUONU: Okay.
As to 3, we just want to know if this is complete. It seems like the message is cut off. I want to make sure that he had a full text message but complete - or completeness in total context.
THE COURT: So, is there - because it looks like it ends in the middle of the sentence.
MR. EDWARDS: That's correct, Your Honor. I'm -
There's - we have an entire phone with multiple messages, but that's what we viewed as relevant for purposes of - of this hearing.

MR. EGBUONU: But - but the Government's trying to confer that this is a threat without seeing the entire message is hard to want - cross examine an Agent as to the nature and substance of the conversation, if we're just getting an excerpt of the conversation.

Your Honor, that's our position.

MR. EDWARDS: Your Honor, this is a state- -- this is a statement of the Defendant. Whether partial or complete, it's still the Defendant's words that the witness testified the Defendant said to her.

THE COURT: Do you have the rest of this message available?

MR. EDWARDS: No, Your Honor. We - we -

THE COURT: Of this specific - rest - message.

MR. EDWARDS: We would have to go - I don't have it front of me, Your Honor.

THE COURT: Okay.

Well, I think that what you need to do is find the rest of this message and produce it to the Defendant.

MR. EDWARDS: Your Honor, we will. We will.

THE COURT: Okay.

All right. I'm going to admit 2 and 3 and 3 subject to a completeness objection that you need to provide him with the rest of that.

MR. EDWARDS: Yes, Your Honor.

Your Honor, and I would just argue that the Rules of Evidence are relaxed, and so we –

THE COURT: I understand.

I'm – I'm admitting it, but I'm still telling you that you need to give him the rest of that message.

(Government's Exhibit 2 and 3 admitted.)

MR. EDWARDS: Yes, Your Honor.

THE COURT: Okay.

BY MR. EDWARDS:

Q All right.

Agent Cline, you indicated that you spoke to another individual connected to the Turkey Leg Hut who indicated they received a threatening message from the Defendant; is that correct?

A That's correct.

Q All right.

I'm going to hand you what's been marked as Government Exhibit 4.

A Oh, sorry. Oh –

MR. EDWARDS: Your Honor, both of these are – are 4, page 1 and 2.

THE COURT: Okay.

Which page is 1? The first sentence says, what?

MR. EDWARDS: Your Honor, page 1 is – begins, "I will come to your house" –

THE COURT: Okay.

MR. EDWARDS: -- "and kill that dog."

BY MR. EDWARDS:

Q Agent Cline, can you describe what this witness told you regarding the context of this message that was sent to her?

And before you do that, who – this witness again was who?

A A former General Manager.

Q Of the Turkey Leg Hut?

A Yes.

Q Okay.

Can you describe –

A Oh, yes. She said that they were arguing back and forth on text messages and provided this text mess where the Defendant texted, "I will come to your house and kill that dog. Stop playing. And I mean it. Snatch his head off."

Q Okay. And did she indicate how this made her feel?

A She was upset and scared.

Q Okay. And do you know if she remains afraid today of the Defendant?

A Yes, she does.

Q Was she reluctant to – to interview with – to conduct the interview with you?

A Yes, she was.

Q All right.

Agent Cline, I'd like to move on - or move back and discuss further your interview with -

THE COURT: Okay. One second.

Let me just read this - I want to read this.

(Pause in the proceedings.)

THE COURT: Okay, Mr. Edwards.

MR. EDWARDS: Your Honor, we good?

THE COURT: You can go on now.

MR. EDWARDS: All right.

And, Your Honor, I do want to - and I can do this after the witness finishes or at the - at the conclusion but address again our basis for proceeding on the detention.

THE COURT: Yeah, later.

MR. EDWARDS: Okay.

THE COURT: Okay.

And on this, do we have the context in which this argument was between the witness and - the manager and the Defendant?

I don't - I don't really get the context of it from here. Do we know that -

BY MR. EDWARDS:

Q Agent Cline, do we have more context regarding the nature of this threat?

A There were multiple text messages, but when we spoke to her it was because - they were arguing because she was trying

to help him and trying to tell him what to do regarding the Turkey Leg Hut, something with it, and he was saying, it's my restaurant; I know what to do.

But it was how he was expressing it to her that she didn't - she didn't like - she didn't think he was treating her well.

Q All right.

Agent Cline, revisiting your interview with John Lee Price, is it correct that he indicated he met the Defendant in 2016?

A Yes.

Q But -

THE COURT: But they were not related - Price and Price?

THE WITNESS: No, ma'am.

THE COURT: Okay.

BY MR. EDWARDS:

Q And in 2018, he indicated that he started working for the Defendant; is that correct?

A That's correct.

Q And 2018 is when the Defendant was released from - from federal prison?

A Yes.

Q For charges related to tax fraud?

A Yes.

Q Can you - and he was - he was given a sentence of 30 months; is that correct?
A That's correct.
Q And a supervised release term of three years?
A Yes.
Q And that supervised release term ended in August of 2020; is that correct?
A That's correct.
Q And the fire is related to the Blue Nova that he's indicted for, and the fire related to Bar 5015 occurred while the Defendant was still under federal supervision; is that correct?
A That's correct.
Q Can you describe what John Lee Price told you he began doing for the Defendant and the work they were doing together in 2018 after the Defendant was released from federal prison?
A Yes. John Lee Price said he did odd jobs for him at the Turkey Leg Hut, getting wood and stuff like that. And then, he said that he also was in business with him with stealing equipment, heavy equipment, side by sides, which are like the ATVs, cars and - and engines.
Q Okay.
And to be more specific, did Mr. Price indicate that - that he had a - a crew that was stealing cars, heavy equipment, tractors, side-by-sides, those types of things, you

know, with - for Mr. Price?
Was there a crew involved?
A Yes. There was a crew.
Q And did he indicate that he - that his crew or him would steal the vehicle, they would - you know, they would either send a message or somehow present the opportunity to the Defendant and the Defendant would say, yes or no?
A Yes.
Q And what were they doing with these cars, trailers, heavy vehicles? What were they doing with it?
A They were selling them.
Q Okay.
In some cases, were they taking the engine out or taking parts and striping - striping, you know, these - these - this machinery or these vehicles down?
A Yes, they were.
Q Okay.
At some point, Mr. John Lee Price told you about a blue Nova that - that he - what - that he presented as an opportunity for the Defendant; is that correct?
A That's correct.
Q He indicated that the Defendant wanted the engine out of the blue Nova; is that right?
A Yes.
Q And another friend of his actually stole the vehicle and

presented it to John Lee Price.
A Yes.
Q And what happened with that vehicle?
A They brought the vehicle to the Turkey Leg Hut. The Defendant Lynn Price told John Lee Price to take the vehicle, the Nova to his mechanic. They brought it to the mechanic. Lynn Price learned later on that the car had been listed as stolen because it belonged to a police officer and told John Lee Price to get rid of it and go burn it.
Q And did - did John Lee Price indicate that he did pick up the vehicle and burnt and get rid of it?
A Yes, he stated that he picked it up from outside of the garage and took it and got it burnt.
Q Okay.
Did he indicate that he was with others when he did this?
A Yes.
Q And did he indicate where he took the vehicle to to burn it?
A Yes, he took it kind of near a retention pond.
Q Okay. An area near - was - did he say railroad tracks and a retention pond?
A Yes.
Q And did your investigation uncover a report of a recovery of a - a 1975 blue Nova near a retention pond and near

railroad tracks?
A Yes, it did.
Q All right.
And I'm going to show you - I'm going to hand you what's been marked as Government Exhibit 5.
And is that the vehicle that was - that was recovered?
A Yes, it was.
Q Okay.
Did Mr. Price - John Lee Price indicate that the Defendant paid him for stealing and setting fire to the Nova?
A Yes, he did.
Q Were you able to locate the owner of the Nova?
A Yes, we were.
Q And was - was it consistent with John Lee Price's statement that they found out it belonged to a police officer?
A Yes, it was.
Q Okay. So, you actually interviewed an individual who had a Nova stolen, and he ended up being a police officer?
A Yes.
Q Did he indicate where the Nova was stolen from?
A Yes. He said the Nova was stolen from a mechanic shop. He reviewed a video of it being stolen. We reviewed a video of it being stolen.
Q Okay.

Did you also review call detail records between the Defendant and John Lee Price during the period from when the Nova was stolen to the time when the arson was committed to the time it was burned?
A Yes.
Q And is it correct that this shows a lot of activity during that – that three, four-day period, right?
A Yes.
Q But then after the No- -- the vehicle was burned, the following day there was no phone activity between the Defendant and John Lee Price; is that correct?
A That's correct.
Q Agent Cline, I believe you saw in the Defendant's criminal history that – that he pled guilty and received a three-year deferred adjudication for arson in 20- -- in 2005; is that correct?
A That's correct.
Q And did you look at reports related to that arson?
A I did.
Q And is it – the Defendant was interviewed as part of that investigation; is that correct?
A Yes, he was.
Q And he indicated that he was approached by an individual, an associate about setting fire to this 1997 Nissan Altima because the individual wanted to retaliate against someone who

either beat up or had an affair with the individual's girlfriend; is that correct?
A That's correct.
Q And the Defendant admitted his role in the arson of that -- that 1997 Nissan Altima?
A Yes.
Q So - okay.
So, in addition to the two charges he's indicted for, the Defendant has a total of three arsons that he is associated with; is that correct?
A That's correct.
Q One of which he pled guilty and received deferred adjudication.
I'd like to turn now to what Mr. John Lee Price told you about drug activity. Mr. Price was arrested and indicted on federal drug trafficking charges; is that correct?
A That's correct.
Q And that was in November of 2023 that he was arrested?
A Yes.
Q And, you know, let me back up.
The stolen vehicles and trailers and tractors and that - that scheme that he was involved in with the Defendant how long did Mr. Price indicate that was going on. Was that a period of years?
A Years.

Q Okay.

And as far as the drug trafficking is concerned, what did he indicate regarding the Defendant's involvement with him and drug trafficking?

A That it began in approximately 2022, '23.

Q And how - and when did it end? Upon his arrest?

A Upon his arrest, yes.

Q And what did he say was the Defendant's involvement?

A He said that he received sales proceeds from - from the hydro-marijuana being sold.

Q Okay.

Where did - where did Mr. Price - John Lee Price indicate he got the marijuana - the hydro from?

A He would travel to California in trailers - horse trailers, and he would bring it back. And it would be stored at the Turkey Leg Hut.

Q Did he indicate why - did Mr. John Lee Price indicate why - indicate why he stored the marijuana at the Turkey Leg Hut?

A Yes, because it - the Turkey Leg Hut had 24 hours to carry.

Q And did you already indicate how much hydro he was - he was picking up and storing?

A John Lee Price stated that he regularly picked up 500 to a 1000 pounds of hydro marijuana.

Q And –

MR. EGBUONU: Your Honor, I'm going to object to this line of questioning. Mr. Price is not charged with any type of drug trafficking. This testimony does not go to any type of provision that the Government has moved on. It's not about intimidating witnesses – just to bolster the Court to detain my client. It's not relevant at all, Your Honor.

MR. EDWARDS: And, Your Honor, this may be a good time to revisit the provision that we can go under regarding danger to the community.

THE COURT: Go ahead.

MR. EGBUONU: Your Honor, under (f)(1)(A), it indicates a crime of violence, but it also indicates an offense listed under Section 2- -- I'm sorry – 2332(b)(G)(v)(b).

And, Your Honor, when you go to that provision, 844 related to arson or bombing of property using interstate commerce is one of those listed provisions.

THE COURT: Arson or bombing of property with the interstate commerce?

MR. EGBUONU: Yes, Your Honor.

THE COURT: And that's what's charged here?

MR. EGBUONU: Yeah. It's our understanding that the arson has to have a 924(c) associated with it to make it a crime of violence.

MR. EDWARDS: Your Honor, it doesn't have to be a crime of violence. The provision says, it's "a crime of violence or." There's an "or" provision.

THE COURT: Let me just look. Hold on.

(Pause in the proceedings.)

THE COURT: Is it 2332? I want to make sure I'm reading –

MR. EGBUONU: Yes, Your Honor.

(G)(v)(b), Your Honor, subsection I.

(Pause in the proceedings.)

THE COURT: Okay. I'm having problems finding it. Let me just look.

MR. EDWARDS: Yeah, I'm not seeing it either, Your Honor.

MR. EGBUONU: Your Honor, we have a printed copy if that – that's help for you.

THE COURT: Okay. That would be helpful.

(Discussion held between counsel.)

(Pause in the proceedings.)

MR. EGBUONU: Your Honor, we have highlighted the relevant portion.

THE COURT: Okay.

So, 84- -- 844(i) – is he charged under 844(i)?

MR. EDWARDS: Yes. He is, Your Honor.

(Pause in proceedings.)

MR. EGBUONU: Your Honor, it's –

THE COURT: Oh, yeah. He's charged in Count 1 under 844(i).

Okay. So, I think you're there on the – on the (f)(1), Mr. Edwards.

Is the maximum term of imprisonment 10 years or more?

MR. EDWARDS: It is, Your Honor.

MR. EGBUONU: Yes.

THE COURT: Okay.

All right.

Thank you.

So, I think that we're under (f)(1) and (f)(2).

All right. So, you can go ahead and continue with the questioning, Mr. Edwards.

MR. EDWARDS: All right.

Thank you, Your Honor.

BY MR. EDWARDS:

Q Agent Cline, we were talking about –

THE COURT: And I don't think you moved to admit Exhibit No. 4 or Exhibit No. 5.

MR. EDWARDS: Your Honor, the Government moves to admit those exhibits now.

THE COURT: Any objection?

MR. EGBUONU: No objection, Your Honor.

THE COURT: Okay.

(Government Exhibits Nos. 4 and 5 admitted.)

MR. EDWARDS: Thank you, Your Honor.

BY MR. EDWARDS:

Q Agent Cline, we were talking about drugs at the Turkey Leg Hut. You indicated that Mr. John Lee Price said that he would bring -- he would move 500 to - was it a 1000 pounds -

A Yes.

Q -- or marijuana?

And I think my question for you was, did he indicate whether the sale of drugs was happening at the Turkey Leg Hut?

A Yes, he did.

Q And what did he indicate regarding that?

A He said that Lynn Price would - had his own packaging for it and would sell the marijuana there.

Q And where would those sales take place, where in terms of location at the Turkey Leg Hut?

A Turkey Leg Hut and the Daiquiri Hut.

Q Okay.

Would it be inside the restaurant -

A Yes, inside.

Q -- out back, or -

A Inside the restaurant.

Q Okay.

And so - and where would the - where would the trailer be parked?
A That - he would park it I think in the back of - I recall in the back of Turkey Leg Hut.
Q Okay. And did he indicate that - that that's where the drug sales would occur was in the back in whatever - you know, whatever vehicle he used to transport?
A Yes.
Q You indicated that he said that there was - that some of the marijuana was in Turkey Leg packaging? Can you describe that - Turkey Leg Hut packaging?
A The way John Lee Price stated he brought three different types of marijuana, and they had - Lynn Price had separate packaging that he would put the marijuana in that had the logo Turkey Leg Hut on it.
Q Okay.
And did John Lee Price indicate where the proceeds - or who shared the proceeds of the drug sales that occurred there?
A Lynn Price had the proceeds and then he would give John Lee Price some money for the delivery.
Q Okay.
And to be clear, this occurred up until John Lee Price's arrest in Nov- -- approximately November of 2023?

A Yes.
Q Did you speak to other witnesses who corroborated the sale of marijuana at the Turkey Leg Hut?
A Yes.
Q Okay. I want to turn now to firearms.
Is it correct that you found firearms at the residence associated with the Defendant just this past Monday?
A Yes.
Q Is it correct that the Defendant was evicted, and when the Constables went into his - his residence on Monday to remove property they found several weapons in a bedroom?
A Correct.
Q And could you - could you describe those weapons?
A Yes. Two shotguns, three rifles, one pistol, a flamethrower, over 960 rounds of various ammunition calibers and some magazines, to include some magazines with the Turkey Leg Hut logo on it.
Q So, magazines that hold ammunition had Turkey Leg Hut logo on it?
A Yes, it did.
Q And you indicated a flamethrower.
What is a flamethrower?
A It's an apparatus that's - this one it's - was from Pulse Fire. That's who manufactured it, and it's an item where it will eject flames up to 25 feet.

Q Okay.

If I want to commit an arson, is a flamethrower a handy item to have?

A I would think so, yes.

THE COURT: How many pistols did you say?

THE WITNESS: One – two shotguns, three rifles and one pistol.

THE COURT: Okay.

BY MR. EDWARDS:

Q And did any of those pistols come back as a – any of those firearms come back as stolen?

A Yes. One did come back as stolen.

Q Okay.

Did you interview an individual from HTX Tactical, a federal firearms licensee that provided information about the Defendant and the purchase or obtaining of firearms?

A Yes, we did.

Q What did that individual indicate?

A The owner stated that he had conversations, text conversations with Lynn Price –

THE COURT: Owner –

THE WITNESS: -- regarding –

THE COURT: The owner of what?

THE WITNESS: HTX Tactical.

THE COURT: And - and what is that?

THE WITNESS: It's a gun store, tactical store. I mean, they sell other things besides weapons.

THE COURT: Okay. So -

Okay. And so, the owner of that store said?

THE WITNESS: That he would communicate with Lynn Price via text messages about prices of guns, types of guns.

MR. EDWARDS: Okay.

BY MR. EDWARDS:

Q Agent Cline, you reviewed the Pretrial Report in this case; is that right?

A I did.

Q And is it correct that in the initial Pretrial Report the Defendant indicated that he lived at a residence with his mother?

A Yes.

Q But based on your surveillance and then other information through your investigative means, you determined that he lived at his own residence, a place he leased since January - I'm sorry - since December of 2024; is that correct?

A That's correct.

Q And he also indicated that there were no firearms in his residence; is that correct?

A That's correct.

Q So, on both accounts was that a lie to the Court?
A Yes.
Q You also learned that the Defendant has not paid rent at his - at his residence at any point; is that correct?
A That's correct.
Q And the owner presently has a complaint - a criminal complaint filed against the Defendant for fraudulent misrepresentations in the lease application; is that correct?
A Yes.
Q All right.
Agent Cline, we're wrapping up a lit- -- we're wrapping up here.
Did - did you have an opportunity to review the Defendant's criminal history and other law enforcement reports regarding allegations of violence or allegations of violations of Protective Orders regarding the Defendant?
A Yes, I did.
Q And in how many reports does it allege that the Defendant violated court-ordered Protective Orders?
A Four.
Q Okay.
And then there are several reports indicating that he was alleged to have committed violence against various individuals; is that correct?
A That's correct.

Q There's a report from October of 2014 by a girlfriend of 10 months indicating he pushed her with both hands at the Oyster Hut?

A Yes. But I - I think it's 2024. You said, "2014."

Q I'm sorry - 2024.

A So, yes.

Q Thank you for the correction - 2024.

A report from February of 2024 regarding a 52 year-old individual who - I'm sorry - made the allegation that Defendant choked him and pushed him to the ground; is that correct?

A Correct.

Q And that was at the - at Tipsey's Lounge?

A Yes.

Q A December 2022 report from a Lyft driver who alleged that the Defendant pointed a weapon at him?

A Yes.

Q And you interviewed that Lyft driver; is that correct?

A Correct.

Q All right.

And that occurred -

THE COURT: What year - what was the date on that one?

BY MR. EDWARDS:

Q Agent Cline, that was December of 2022; is that correct?

A Yes.
Q And that Lyft driver indicated he was parked in a lit area in front of the Turkey Leg Hut?
A Yes.
Q All right. And did he express – what type of fear did he express when the Defendant pointed a weapon at him?
A He was extremely afraid.
Q And there is a report from July of 2021 in which the Defendant's wife alleged that he slapped her while knowing she was pregnant; is that correct?
A Correct.
Q And then, there are a couple of convictions; one, from January – well, one conviction – I'm not sure of the year – when the Defendant pled to assaulting his wife and received the 60-year – 60-day jail sentence?
A Yes.
Q And one from November of 2004, a disorderly conduct charge and disord- -- displaying of a firearm for which he received 30 days in jail?
A Yes.
Q Agent Cline, were you in contact recently with investigators from the Department of Public Safety about an ongoing investigation involving the Defendant?
A Yes, I was.
Q And is the subject of that investigation – you know –

stolen vehicles, identity theft and then other fraud related matters?
A Yes.
Q And did – did that investigation identify the Defendant as a stolen car salesman?
A Yes, it did.
Q In fact, there were two cars identified as being stolen, a Rolls Royce and a Grand Cherokee, from 2023?
A Yes.
Q And is that consistent with the activity that John Lee Price indicated that he and the Defendant had been involved in?
A Yes.
MR. EDWARDS: I pass the witness, Your Honor.
MR. EGBUONU: May I proceed, Your Honor?
THE COURT: Wait a minute.
(Pause in the proceedings.)
THE COURT: Okay. You can go on.
MR. EGBUONU: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. EGBUONU:
Q Agent Cline, I just want to ask some questions as it relates to the testimony that you provided this morning.
THE COURT: I'm sorry.
BY MR. EGUONU:

Q Let's start with the –

THE COURT: Mr. – can you – can you –

MR. EGBUONU: I'm sorry –

THE COURT: -- just talk into the mike so that -=

MR. EGBUONU: I apologize, Your Honor.

THE COURT: -- she can hear.

I can hear you, but we want the tape to pick it up.

MR. EGBUONU: Not a problem.

BY MR. EGBUONU:

Q Let's start with taking a look at Exhibit 1 to this hearing.

A Okay.

Q Earlier you testified that there were four individuals in this still shot of surveillance from 5015, correct?

A Yes, sir.

Q And you were able to identify each of these individuals through a statement that John Price made, correct?

A I could only through his statement only identify two with him. So, three together, not all four.

Q Okay.

Did you ask him who the other person was?

A We did ask him who the other person was. Yes.

Q Okay.

Did he provide that information?

A He -- he said he thought it was some- -- yeah, he did say it was Big J.

Q Okay.

Do you know Big J's real name?

MR. EDWARDS: Your Honor, this matter is still under investigation, and so that's why we've intentionally not mentioned the identity of the fourth individual. We don't wish it to frustrate efforts to – to find and arrest someone who is an unindicted individual.

THE COURT: Mr. –

MR. EGBUONU: Your Honor, I'm just trying to – this is what the Agent testified to. I'm trying to get the factual basis as it relates to these charges against my client.

I want to know who the individuals were and if my client was one of those individuals that are in this still shot or are being alleged that in there when this fire was set.

THE COURT: Well, ask her that question without talking about the identity of that other person. How about that?

MR. EGBUONU: Yes, Your Honor.

BY MR. EGBUONU:

Q Based on your interview with John Price, it's fair to say that Mr. – Mr. Lynn Price was not – Mr. Lyndell Price was not at the location when this fire was set, correct?

A Correct.
Q And Mr. Lyndell Price did not - is not the one holding the fire source, correct?
A Correct.
Q When did your investigation of the arson or - yeah - the arson of the 5015 premises start?
A I believe it started in 2022. We reached out to Houston Arson Bureau regarding the 5015 fire.
Q And who else did you speak to?
A We - well, at the time the Arson Bureau investigator was part of - he was a Task Force Officer with ATF, so we spoke to them as well.
Q And in 2022, was Mr. Lyndell Price a target of your investigation as it related to this arson?
A His name was mentioned and then investigation that we - that we were conducting, that the information we were provided is that John Lee Price worked for Lyndell Price and Source reporting was that from the investigation that he was involved.
Q And so - so, it's fair to say since 2022 you've been investigating this arson, including my client, Lyndell Price, correct?
A I think that's fair to say, yes.
Q And here we are in 2025 now charges are being brought against Mr. Price - Lyndell Price, correct?

A Yes, sir.

Q So, he's been in the community for at least three years during the course of your investigation, correct?

A Yes, sir.

Q Never thought to brought - to bring him in, correct?

A We did not, no, sir.

Q Left him in the community during this three-year period, correct?

A Yes.

Q And - and more importantly this has been almost five years since the actual burning of 5015 occurred, correct?

A Yes.

Q If he were such a danger to the community, why wasn't there a sense of urgency to bring him in?

A Well, we were still conducting an investigation.

Q Well, let's - let's talk about that.

Essentially John Price is the source of most of your information, correct, as it relates to this investigation?

A I don't think that's fair to say. We interviewed a lot of people through the course of the investigation that provided information.

Q Well, is this - until John Price made a statement, you felt that you didn't have enough to bring charges against Mr. Price, correct?

A I - it wasn't my job to pursue charges. We were in the investigation process, so we were continuing the investigation and identifying people.
Q When - when did the initial conversation with Mr. John Price occur?
A The initial conversation? We spoke to him prior to his arrest. We went out to his apartment and attempted to talk to him, where he said he didn't have any knowledge of it, and then we interviewed him again in 2023.
Q Okay. So, I'm clear - prior to his arrest, when did that interview take place?
A I would have to go back and see. I'm not - I'm not really sure.
Q Okay.
Do you think that's important information for us to know?
A It was before the stop in November of 2023.
Q Okay. So - so, it's fair to say that prior to his arrest Mr. Price - Mr. John Price had no information connecting - or - well, let me ask it this way.
Prior to Mr. John Price's arrest, he provided no information naming Lyndell Price as someone that was associated with the arson at 5015, correct?
A Correct.
Q That's correct?

A That's correct.
Q And after Mr. John Price was arrested for trafficking Fentanyl, that's when he provided information or stated that Mr. Lyndell Price was involved in this particular arson of 5015, correct?
A Correct.
Q And when did that occur?
A Which one, the -
Q The second statement after his arrest.
A In December.
Q December of 2020?
A 2023 when we went to visit him.
Q So, since December of 2023, up until last week, when my client, Mr. Lyndell Price, was arrested he was in the community that you're now saying that he's a danger to, correct?
A He was in the community.
Q How was the information brought to you that Mr. John Price had information relating to the arson after his arrest?
A We reached out to - to the arresting agency in Mississippi and asked if Mr. Price was up for an interview.
Q And before you did that, were there any - were there any points of time where either you or your office made contact with Mr. Lyndell Price in the course of this investigation?
A Not that I can recall.

Q So, there's never a time where you spoke to him or any of his represent- -- lawyers or representatives?
A Not that I personally did, no.
Q Okay.
Did any- -- anybody in your agency or teams speak to any of his lawyers as it relates to this investigation?
A Well, can you be more specific on who his lawyers were at the time?
Q Well, let me ask it this way.
Can you speak to who people in your agency would have spoke to on Mr. Lyndell Price's behalf?
A Just the people that we were identifying through the course of an investigation.
Q Okay.
Even if you weren't – even if you didn't speak with a lawyer directly, were you made aware that a lawyer spoke to someone in your agency as it relates to this investigation?
A I'm not aware. I don't recall that.
Q Okay.
So, during the course of the investigation, you – you contacted and spoke with John Price, and you also stated that you spoke with Armani Williams, correct?
A Correct.

Q And in this interview, I wasn't clear; did - did he state that Mr. Price had involvement?
A Did Mr. Williams?
Q Yes.
A He did. He said that he went with John Lee Price.
THE COURT: Are you talking about Defendant Price? It's a little confusing.
BY MR. EGBUONU:
Q Well, I'm sorry. Sorry.
A I'm sorry.
Q Did he state that he had involvement with my client, Mr. Lyndell Price?
A Yes, sir. He did, but to be - so, you understand the involvement he said he had with Mr. Lynn Price is that he was an employee of his at one time.
Q Okay.
But he didn't say that my client paid him to set Bar 5015 on fire, correct?
A No, he did not.
Q Mr. Armani Williams did not state that, correct?
A No.
Q So, the only person that has stated that during the course of your investigation is Mr. John Price, correct?
A Yes.
Q And Mr. John Price stated this only after he was charged

with trafficking almost more than 12 kilos of Fentanyl, correct?

A Yes.

Q And - and that statement was also different than a prior statement that he made, correct?

A Correct.

Q The other individual you identified was - I believe you stated was Masia Shepherd; is that correct?

A Yes.

Q And Masia Shepherd he didn't say that Mr. Lyndell Price paid him to set 5015 on fire; did he?

A No.

Q Earlier you testified that the statement that John Price made was - strike that.

You talked about there was motive for this fire. Do you remember that?

A Yes.

Q And you said the motive - based on your conversation with Steve Rodgers was he did not want Mr. Lyndell Price to be a part of Bar 5015, correct?

A He did- -- he did not want him as a partner in 5015.

Q Do you know what other establishments Mr. Steve Rodgers has ownership in around the City?

A He has several.

Q Several ownerships and several bars, correct?

A Correct.
Q And that's something that you found out during the course of your investigation, correct?
A Correct.
Q And that's also information that is readily available and people know about, correct?
A Yes.
Q And none of those other establishments that Mr. Steve Rodgers have ownership in has been set on fire; has it?
A Not to my knowledge, no.
Q Specifically, Mr. Rodgers is a part owner in Prospect Park, correct?
A Correct.
Q And Prospect Park wasn't set on fire; was it?
A No, it was not.
Q And Prospect Park what you would agree is that more direct competing business to the Turkey Leg Hut, correct?
A I can't say that. I don't know anything about Prospect Park.
Q Well, let me ask you this.
At 5015 that was more of a nightclub, correct?
THE COURT: If you know.
THE WITNESS: Well, they serve food there as well, so -
THE COURT: If she knows -

BY MR. EGBUONU:

Q If you know.

THE COURT: -- that.

THE WITNESS: I don't really know. I know they serve food there as well, so I wouldn't say it as strictly a bar.

BY MR. EGBUONU:

Q Okay.

You said that they serve food –

A Crawfish.

Q Is it a restaurant?

A I don't think it's designated as a restaurant.

Q Exactly. It's designated as a bar, correct?

A Bar 5015, yes.

Q And it's designated as a nightclub, correct?

A I'm not a- -- I don't know if it's designated as a nightclub.

Q Okay. And Prospect Park – how would you describe Prospect Park?

A I have no knowledge. I know it's a bar, but that's basically it.

Q Have you ever been to Prospect Park?

A I have not.

Q Agent Cline, have you seen the FBI report in this particular investigation?

A Which one?

Q Well, I don't know what report.
This one. Have you seen this one?
A Can I - can I look at it?
Q Yeah, of course.
May I approach the witness, Your Honor?
THE COURT: Yes.
(Pause in the proceedings.)
THE WITNESS: Yes, I have.
BY MR. EGBUONU:
Q Okay.
In that report it talks and describes 5015 as a nightclub, correct?
A Yes.
Q And it's fair to say that Turkey Leg Hut was not a nightclub, correct? It was a restaurant.
A Yes, it's a restaurant.
Q So, why would - well, if - if Mr. Price was motivated to set a competing business on fire, no other businesses that Mr. Rodgers had ownership in that were directed to any businesses were set on fire, though, correct?
MR. EDWARDS: Your Honor, I'm going to object. This calls for speculation, and I think we get the Defense counsel's point about - about motive.
MR. EGBUONU: Well, Your Honor, she testified heavily on direct that the motive that Steve Rodgers said was it was a

competing business, and he didn't want him to have a competing business. I'm just simply just getting the Agent to confirm that Mr. Rodgers had multiple competing businesses, and none of those other businesses were set ablaze at all.

MR. EDWARDS: Your Honor, this is more argument as opposed to, you know, kind of a discovery inquiry, so we –

MR. EGBUONU: I can't argue until she testifies to it.

THE COURT: Well, you can ask her, and I think you already asked her the question, whether those other businesses were burned down.

MR. EGBUONU: Okay.

THE COURT: And she's already said, no.

MR. EGBUONU: Okay.

THE COURT: So, I think you're there.

MR. EGBUONU: Okay.

Thank you, Your Honor.

THE COURT: Because she's not going to know why the Defendant did anything or didn't do anything.

MR. EGBUONU: Well, she testified that –

THE COURT: No, she testified that –

MR. EGBUONU: That Mr. Rodgers –

THE COURT: -- Steve Rodgers said.

MR. EGBUONU: Okay.

THE COURT: Okay? So, that's different than saying

that the Defendant was motivated. This is what –

MR. EGBUONU: Under- --

THE COURT: This is what Steve Rodgers said.

MR. EGBUONU: I understand, Your Honor.

BY MR. EGBUONU:

Q Agent Cline, let's take a look at the – Exhibit 2 and 3, those text messages that you testified to earlier.

A Okay.

Q Without reading the expletives and profanity, did Mr. Lyndell Price ever make any threats of violence in these text messages?

A Not in – Mr. Rodgers construed that they were threatening in nature. But to answer your question, no.

Q So, you being an objective reader of these text messages you didn't see any threats of violence in these text messages, correct?

A I think it could be threatening that this is my last time telling you, as in what would happen next time.

Q Did he say what would happen next time?

A Not that I – no, not that I'm aware of.

Q There's nothing on the face of this text message that states, I am going to do this to you next time, correct?

A Correct.

Q And there's no – nothing on the face of these text messages that actually states anything by them, correct?

A Correct.
Q It's just a bunch of profanity?
A Yes.
Q The text message as it relates to the General Manager isn't it true that this General Manager stole money from the Turkey Leg Hut?
A I believe it's alleged. We - I - that was - that was mentioned, but I don't know if she did or not.
Q But that's something that you omitted on Direct.
So, there are allegations that this General Manager that he's arguing with via text stole a large sum of money, correct?
A Okay. I didn't omit it because it wasn't asked. They were arguing about it, and I don't know during these text messages if they were arguing about that.
Q Well, we asked for context, so is it your understanding based on your interview this individual or during the course of your investigation did you discover that it's alleged that this individual, the former General Manager that he was texting has stole money from the Turkey Leg Hut, her previous employer?
A Yes.
Q So, could this have been about the money that she stole?
A I'm not sure.
Q You don't know one way or the other, correct?

And again, just to be clear, there's no threats of violence against her, correct?
A No, just her dog.
Q And do you know if her dog is alive and well and safe?
A I don't know that.
Q Okay. She didn't tell you that her dog's head was ripped off; did he - did she?
A No, she did not.
Q Okay.
And just for clarification, do you know the date of these text messages?
A Right now, no, I do not. She provided multiple, multiple text messages. I'm -
Q About how many?
A Between 15 and 20 and a video as well, so I'm not sure what - what the date is.
Q And - and through all the text messages she provided, this is the only thing that you were able to ascertain as potentially being threats, correct?
A Correct.
Q And we don't know the date of these text messages. They could have been from seven years ago, correct?
A I'm not sure. I don't have that in front of me, and I don't have it date stamped here, so -
Q Okay.

You would agree that the date of this text message is important information for us to know, correct?
A I - I mean, I don't know how - in context to what - what the date would be. I know they argued. I don't know - and then she is no longer a manager.
Q Well, you - you testified as to this being a propensity for him to be a danger. So, you don't think when this occurred is relevant information?
A I just don't - I don't have the dates with me.
Q Okay.
A I'm not sure.
Q And you can agree that Turkey Leg was - is a business - or was a business that has been in operation or was in operation more than seven years ago, correct?
A Yes.
Q So, this could have been a text message for all we know from over seven years ago, correct?
A Correct.
Q You testified about John Price and how him and Mr. Lyndell Price met. You stated that they met in 2016, correct?
A That's what Mr. Price said -
Q And -
A -- John Lee Price said.
Q And he started working for Mr. Lyndell Price in 2018?
A Yes.

Q And that was at the restaurant?
A He did odd jobs at the restaurant but then also was stealing heavy equipment and other things for him.
Q And that's only - and that information is information that you received from the interview of John Price, correct?
A Correct.
Q And it's fair to say that it's not an ordinary - it's not something that's out of the ordinary for a manager to text his employee that worked for him, correct?
A Correct.
Q It's actually quite common; you would agree?
A Yes.
Q And again, you - there are no text - you don't have the text messages between Mr. Lyndell Price and Mr. John Price; do you?
A I do not.
Q So, you don't; know the nature and the substance of those conversations, except for what Mr. John Price is telling you, correct?
A Correct.
Q And we've already established that - he didn't tell you all this information until he was charged with drug trafficking and facing a mandatory minimum of at least 10 years correct?
A I don't know what he was facing, but, yes, it was after -

it was when he was in Mississippi.
Q You didn't think that that was convenient for him to now have this information as it related to Mr. Lyndell Price after he was charged with drug trafficking, Fentanyl and 50,000 pills?
MR. EDWARDS: Your Honor, that calls for speculation on the part of the Agent.
THE COURT: I think you've already asked this. I think you've already -
MR. EGBUONU: Okay. I'll move on, Your Honor.
THE COURT: You can move on.
MR. EGBUONU: Okay.
BY MR. EGBUONU:
Q You asked - or you testified to Mr. Lyndell Price's tax fraud case earlier, correct?
A That he was convicted, yes.
Q And he completed his sentence; he served his time, correct?
A Correct.
Q And he completed his supervised release with no issues, correct?
A (No audible response.)
Q Well, let me ask it this way.
A Sorry.
Q Was there any violations of supervised release submitted

to the Court?
A Not that I'm aware of.
Q I want to delve in and talk about the - the stealing of the cars and heavy equipment.
So, it sounded like this was something that John Price did and then he went to try to sell it to individuals. Am I correct?
A He had a crew, and, yes, that's - he did do that.
Q So - so, John Price created his own crew and went out and stole vehicles and heavy equipment and tried to sell it to the highest bidder, essentially, correct?
A I'm not sure if he sold it to the highest bidder or - or who he sold it to, but, yes, that is what he would do would - the goal would be to sell it.
Q Okay.
So, as it relates to the Chevy Nova, John Price could have stole the Chevy Nova and then presented it to Mr. Pri- -- Mr. Lyndell Price and - to see and acquire if he wanted to buy it, if that happened, correct?
A I'm sorry. Say that - say -
Q Well, let me ask it a different way.
You don't have any text messages that shows Mr. Lyndell Price directing John Price to go and steal that Chevy Nova; do you?
A I do not.

Q You don't have any telephone calls, wire taps or anything that shows that Mr. Lyndell Price directed John Price to go steal that Chevy Nova, correct?
A And you don't have any text messages that shows Mr. Lyndell Price directing John Price to set that car on fire, correct?
A No.
Q All you have is the word of Mr. John Price and nobody else, correct?
A Yes.
Q You talked about a 2005 arson. Do you recall that?
A Yes.
Q And you testified that Mr. Lyndell Price received a deferred adjudication for that, correct?
A Correct.
Q And you would agree that that is not a conviction, correct?
A I'm not - I don't know how it is that he admitted to it and then received deferred adjudication.
Q And based on your review of the file, he successfully completed that deferred adjudication, correct?
A Yes, he did.
Q And based on the review of that file, do you know who his lawyer was in that case?
A I don't recall.

Q You talked about a period of years of involvement of drug trafficking. Do you recall that?
A I'm sorry. Say that -
Q Of drug trafficking. Do you recall that?
A For - for who?
Q For my client, Mr. Lyndell Price.
You stated that he was involved in drug trafficking, correct?
A Yes, the sale of it when it would come to the Turkey Leg Hut.
Q Okay. So, he wasn't - he wasn't involved in drug trafficking; is that your testimony?
A He was involved when John Lee Price would bring the trailer to the Turkey Leg Hut.
Q Okay. So, I'm clear.
You're not testifying and stating that Mr. Lyndell Price instructed John Price to traffic narcotics across America.
A He paid John Lee Price to traffic the marijuana from California to the Turkey Leg Hut.
Q And - and to be clear, Mr. Lyndell Price hasn't been charged with drug trafficking, correct?
A No.
Q But it's your understanding that Mr. John Price has been, correct?

A In Mississippi, yes.

Q And all the evidence as it relates to the drug trafficking is also based off the word of John Price, correct?

A Correct.

MR. EGBUONU: May I approach, Your Honor?

THE COURT: Yeah.

Can I ask a quick question?

Did you say that you had corroborated from others besides John L. Price that – that the marijuana was actually being sold out of the Turkey Hut?

THE WITNESS: Yes, out of the Turkey Leg Hut and the Daiquiri Hut. But other people did tell us that through the course of the investigation.

THE COURT: I understand.

And just for me, because I don't know what the Daiquiri Hut or the Turkey Hut is. Sorry. I never went there.

The Daiquiri Hut is part of the Turkey Hut?

THE WITNESS: Yes.

THE COURT: So, that – like, so you have this restaurant called the Turkey Hut, and the Daiquiri Hut was a part of it in the back?

THE WITNESS: I'm not sure where it was, 'cause I never went to that. But that it was Lynn's – Lynn Price's as well.

THE COURT: Okay.

THE WITNESS: And it was next to it.

THE COURT: Next to it. Okay.

So, you confirmed from others that drugs were actually being sold out of the Turkey Hut and the Daiquiri Hut?

THE WITNESS: Yes.

THE COURT: And did they say who specifically was selling them?

THE WITNESS: No. That –

THE COURT: Okay.

You can go ahead.

MR. EGBUONU:

Q Okay. Before I do that – you would agree that both the Daiquiri Hut and the Turkey Leg Hut had countless employees, correct?

A I'm not sure how many employees they had, but, yes, they had – they had multiple employees.

Q You would agree that it was a very successful restaurant in a busy place? They had a number of employees, correct?

A Yes.

Q Okay.

I just want to – was this part of the file that you looked at as it relates to the 2005 arson to refresh your recollection?

A It is. I didn't – I never saw this. I only saw the actual police report, so.
Q Okay.
Well, can you describe what you're looking at, and if you have any –
A Yeah, it's the – the paperwork for the Order Deferring Adjudication of Guilt.
Q And in looking at that paperwork, do you see who is law- -- who Mr. Lyndell Price's lawyer is?
A B. Hart.
Q No, that's the judge.
A I'm sorry.
I'm sorry. Oh, it just says, Attorney for the State, so I apologize.
Okay.
Q Further on the –
A I'm sorry – attorney – L. Quinones.
Q And is that the same attorney that represents Mr. John Price currently?
A Yes.
Q You didn't think that was problematic that an attorney that's represented Mr. Lyndell Price, remember, since at least 2005 is now representing the co-defendant that's cooperating against him?
MR. EDWARDS: Objection, Your Honor.

THE COURT: I mean -

MR. EGBUONU: Well, I need to go, Judge -

THE COURT: Well, first of all, it's a conflict of interest that has nothing to do with this witness.

MR. EGBUONU: Well, it goes to my client's due process rights being violated during -

THE COURT: But she's not violating. She's not the Court. That's a motion that your client should be making to the Court that there's a conflict of interest.

MR. EGBUONU: Okay.

THE COURT: It doesn't - it doesn't have nothing to do with this witness, and I don't think she's in any position to judge.

MR. EGBUONU:

Q During the course of your investigation, who else has worked with you during the course of this investigation?

A What do you mean by that?

Q Who else - has another Agent assisted you in this investigation?

A Multiple Agents have assisted.

Q Okay.

And has any of those Agents reached out to you - well, I strike that, strike that testimony.

THE COURT: Okay. I just have a quick question, because it - it's twenty to twelve, and I have another

hearing -

MR. EGBUONU: Okay.

THE COURT: -- that was supported to start at 11, so - and you may have evidence that you're presenting.

Are you going to put on evidence?

MR. EGBUONU: We are, Your Honor. We have, I believe, three witnesses and one proffer. So, I can just give you the statement. I don't have to read it.

THE COURT: Okay.

So, we're going to need to speed along a little bit.

MR. EGBUONU: Yeah. I'm moving as fast as possible, but the Government asked quite a bit of questions, Your Honor.

THE COURT: Yeah, but I think you both have had about the same amount of time, so.

MR. EGBUONU: Oh, I will -

THE COURT: I don't want to - I just don't want to cut you off from being able to present your case.

MR. EGBUONU: I understand, Your Honor.

MR. EGBUONU:

Q As it relates, let's - let's pivot and transition to the execution of the search warrant, the execution of the search warrant at the residence that you testified to earlier.

A There was no execution of a search warrant.

Q Oh, there wasn't.

A No.
Q Okay. So - so -
A There was this seizure warrant, but there was no search warrant because it was the homeowner's and he gave us consent to be there.
Q Okay. And - and who was that homeowner?
A Daniel Hays (phonetic).
Q Well, it was my understanding that Mr. Lyndell Price was living there, so how did the homeowner give you consent?
A He gave us consent after the eviction.
Q How long had Mr. Daniel Hays been at the property prior to your arrival?
A I'm - I'm not sure. I got there Monday morning. I don't know how long he was there prior to me being there.
Q Do you know that he was there over the weekend?
A Yes.
Q And had access to the entire home over the weekend?
A Yes.
Q And can you speak to, if you know, who found the firearms?
A The Constables, I believe found the firearms.
Q The Constables weren't accompanied by the FBI?
A No. When I arrived on scene at the house, the weapons were already in the garage.
Q And do you know who placed them there?
A The Constables.

Q And you said you ran – you ran the firearms to see whether they were stolen or registered to somebody, correct?
A So, part of our policy is that each of the firearms has to have an e-trace and an Ivan (phonetic), yes, and we ran NCIC to see if any of the weapons were stolen.
Q Did you – were you able to ascertain if the weapons were registered to anyone?
A Yes.
Q Who were they registered to?
A Well, different people. I mean, I – I don't have – they were registered to a multiple of different people.
Q You would agree that multiple people were denied access to the home over the weekend, correct? You have knowledge of that, correct?
A I don't know if multiple. I know of one person, but I don't know if multiple people went to that ad- -- to that address over the weekend.
Q So, you would agree that if somebody was trying to get Mr. Lyndell Price's property to remove it it wasn't abandoned property, correct?
A I don't know the legalities of it. I –
Q So, earlier you testified about a lot of different instances or allegations, some being the Tipsey Lyft driver. None of those cases or allegations resulted in the conviction, correction?

A I believe the one from 2024 is still pending. So, the other ones –

Q But the other ones – we can look at the Pretrial Report that they're not – but the other ones were all dismissals or – or were not even filed, correct?

A Except for the 2015 phys- -- the domestic with Nikia Price where he did plea.

Q Well, I'm speaking to the allegations as it relates to Tipsey and the Lyft driver.

A Correct.

Q But those were dismissed, correct?

A Yes.

Q And the allegations as it related to this domestic dispute he received a deferred adjudication, correct?

A Yes.

Q Which he successfully completed, correct?

A Yes.

Q Well, lastly, about the residence. Do you know what time that the weapons were confiscated or placed in the garage?

A At approximately 9:30. That's – when we interviewed the Constables, they – that's when they said they entered the home is approximately 9:30.

Q And based on your surveillance, you stated earlier that you were surveilling that property for some time, correct?

A We were surveilling that property when we got the arrest

warrant to see - to see if he was going to be there; so, yes, during that time.

Q And based on your understanding that - of - during the course of your investigation and your surveillance, multiple people lived at that property in Missouri City, correct?

A Not to my knowledge, no.

Q Okay.

I pass the witness.

MR. EDWARDS: This is really briefly, Your Honor.

THE COURT: Very briefly.

MR. EDWARDS: Your Honor, just in the interest of time, I'm going to pass the witness. We don't have any questions.

THE COURT: Okay.

Do you have any further evidence?

MR. EDWARDS: We don't, Your Honor.

THE COURT: All right.

And you may step down.

Thank you.

All right.

MR. EGBUONU: Your Honor, just out of the time, do you want me to -

THE COURT: Who - tell me who your witnesses are -

MR. EGBUONU: We have his mother.

THE COURT: -- and what their relation is.

MR. EGBUONU: We have his mother who will testify to being able to be a third party custodian in a report issued bond conditions. We can proffer that, or we can have her testify.

We have Mr. Leon – let me get his last name – Leon Kenloch. He's a executive, former executive from United, who will be able to speak to Mr. Lyndell Price's community ties, things of that nature. And then, we have a – is he still here – a Michael Saldano, who will also be able to speak to Mr. Lyndell Price's community ties and things of that nature.

We have a letter – I can give them to the Court. I have already given a copy to Government's counsel – of Don Chaney, former NBA basketball player and coach, who sent a letter of support, since he was unable to travel here this morning, that we would just proffer and further show Mr. Lyndell Price's community ties and things of that nature.

THE COURT: Okay.

MR. EGBUONU: So, I'm open to do it however the Court would like us to do it.

THE COURT: Is it almost a quar- -- is it a quarter? I'm trying to look at the time. Is it almost ten 'til?

MR. EGBUONU: It looks like 11:48.

THE COURT: Okay. So, it's ten 'till.

Well, you know, why don't you put on one

witness, whoever you want. I'm not going to tell you how to present your case, put on one witness, proffer all the rest, and give me the letter.

I would have liked you to bring Don Chaney here.

MR. EGBUONU: I would, too.

THE COURT: Here. Give that to Carol.

MR. EGBUONU: Would you be okay with us proffering –

THE COURT: You can proffer.

MR. EGBUONU: And that's his mom, who will be able to serve as a third-party custodian.

THE COURT: Has she -- yeah, has she been vetted by Pretrial?

MR. EGBUONU: Yes. Yes.

THE COURT: Okay.

MR. EGBUONU: So, we would call –

THE COURT: I thought – well, the Pretrial Service report that I saw said it was uncorroborated; they weren't able to get ahold of the mother.

MR. EGBUONU: I think there's an Addendum. We were to present –

THE COURT: I haven't seen an Addendum.

Did you get an Addendum?

CASE MANAGER: I got an Addendum.

THE COURT: You did? I don't see it.

Oh, I see it, yeah. I didn't see it before.

Let me take a quick read of that.

(Pause in the proceedings.)

MR. EGBUONU: Your Honor, may Mr. Leon - I think we'll just do him.

THE COURT: Okay.

MR. EGBUONU: And then, I'm assuming the Court is still looking at the Pretrial -

THE COURT: I'm still reading, yeah.

MR. EGBUONU: Okay.

(Pause in proceedings.)

THE COURT: Okay.

I'm done. You can call your witness.

MR. EGBUONU: Yes, Your Honor.

We call Mr. Leon Kenloch to the stand.

He hasn't been sworn.

(Witness sworn.)

MR. EGBUONU: May I proceed, Your Honor?

THE COURT: Yes.

Mr. Kenloch, adjust that microphone so it's close to your mouth so that the Court Reporter can record what you're saying. Okay?

THE WITNESS: Okay.

THE COURT: Thank you.

LEON KENLOCH, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. EGBUONU:
Q Good morning, can you introduce yourself to the Court, sir?
A My name is Leon Kenloch.
Q And, Mr. Kenloch, do you understand the purpose of why you're testifying here this morning, correct?
A Yes.
Q Can you briefly discuss, briefly your professional background?
A I worked for Continental Airlines and United Airlines. I have retired. I retired in 20- -- 2020, 2014 – excuse me. Prior to retirement, I served as an officer for the company for – the companies for approximately 17 years.
Q Okay. And how did you come to be acquainted with Mr. Lyndell Price?
A I'm a good friend of the family. I've known the family for over 35 years.
Q And during that course of knowing them for over 35 years, has he always lived in Houston?
A To my knowledge, but I'm not sure.
Q Okay.
Can you describe some of your, you know, interactions, some of the highlights you've seen as it relates to Mr. Lyndell Price's character?
A Sure.

I would say this: He's got a huge heart. He is his mother's son. His mother is exceedingly generous, and he has shown himself to be the same. He would give you the shirt off of his back if you needed it. He was always looking to help people.

Q And - and basically, on your experience, a lot of the people that he helped were people in need, correct?

A That is correct.

MR. EGBUONU: Your Honor, I could - I don't know if the Government will have objections. I can tender it, or I can just give it to you.

These are just pictures of Mr. Lyndell Price helping people at a community hearing, various natural disasters - elderly people's homes that had trees fall on them, cars that have cars (sic) fall on them - fall on them - excuse me. Mr. Price would use his own money and go out and cut trees down -

THE COURT: Are you offering them through this witness?

MR. EGBUONU: I can give them to you however you want me to do it.

THE COURT: Offer it through the witness.

MR. EGBUONU: Okay.

BY MR. EGBUONU:

Q I want to give a couple of pictures to you.

Are these some of the things that you've seen Mr. Price do as relates to help in the community and providing assistance to those in need?
A Am I aware of them? Yes.
Was I personally there? No.
Q And I understand that.
But do these fairly depict the service, the community service that Mr. Lyndell Price was frequently involved in?
A Yes.
MR. EGBUONU: Your Honor, I would like to offer and enter these Exhibits 1 - Defendant's 1 through 4.
THE COURT: What is this letter? Is this letter going to be Exhibit 1?
MR. EGBUONU: Yeah, I will give you that Exhibit 1 and the rest 2 through 5.
MR. EDWARDS: No objection.
MR. EGBUONU: You said, no objection?
MR. EDWARDS: No objections, Your Honor.
THE COURT: Okay.
They're admitted.
And No. 1 is admitted.
(Defendant's Exhibits Nos. 1 through 5 admitted.)
BY MR. EGBUONU:
Q What were some of the other things that you witnessed

Mr. Lyndell Price do to help those in need?
A Well, I'll say one specific example as it relates to my family, and it's kind of a pattern of what he does for other people.
About two and half years ago, almost three years now ago, my mother-in-law died suddenly in our home, and we were overwhelmed with tons and tons of people coming to lend support. Lyndell reached out and said, Kenloch, I got you, and he sent just unbelievable amounts of food to make sure that everyone was taken care of, as we had people from the City, also out of town, visitors, support my wife during the loss of her mother.
Q And you've also been aware of the numerous proclamations and awards he's received from politicians, including our former mayor, correct?
A Yes.
Q Even - so, even knowing what he's charged with, you would say that that's not consistent with his character, correct?
A It is not the person I've come to know. No.
Q And even though he's charged with these charges, you're still here to testify on his behalf and support him and look the Court - and testify on his behalf, correct?
A Based on what I - my interactions with him, he's been respectful to me. We've never had a negative interaction. I can't speak to what charges are out there. I can just tell

you from my personal interactions with him they have been always supportive and generous.

Q Thank you.

We pass the witness, Your Honor.

THE COURT: Mr. Edwards?

MR. EDWARDS: No questions, Your Honor.

THE COURT: Okay.

You may step down.

Thank you for coming in.

THE WITNESS: Thank you.

THE COURT: All right.

And do you want to make a proffer as to Michael Saldano?

MR. EGBUONU: Yes, Your Honor.

If Mr. Saldano was here to testify, he would testify along the same lines that Mr. Price has – always lended a helping hand; he always went above and beyond his service of his community.

He would also testify that Mr. Lyndell Price is a long – a long residing resident of Houston, Texas. He's always lived here.

He would further testify that he's known him for over 20 through the church that they attend, and he's always had positive experiences with Mr. Lyndell Price.

MR. SALDANO: Yes.

MR. EGBUONU: And he's here in Court. He's here to testify. But out of an abundance of caution, you know, we had another hearing after us, we're just going to proffer his testimony.

THE COURT: Okay.

MR. EGBUONU: And Ms. Shirley Price, we would proffer that she would be able to serve as a third-party custodian. She would insure that Mr. Price would make his court appearances. She would report if there were any wrongdoings to Pretrial Services. She would insure that he would adhere to any conditions set by this Court or Pretrial Release, if she were to testify.

And that's his mother, Shirley Price.

THE COURT: And - I'm sorry - she said that he could live with her if that were required?

MR. EGBUONU: Yes.

THE COURT: So, she has a home big enough for - with a bedroom, extra for him?

MR. EGBUONU: And that's correct. Because he's been evicted out of that Missouri City.

THE COURT: Right.

MR. EGBUONU: She has no weapons in her house. You know, even the weapons which we would argue are not his weapons that were seized at the Missouri City home, even if there was a concern that there were weapons, the Government

has – they're in possession of those weapons, and she has no weapons in this home.

And also – and I meant this for argument – but it's also important to note that, you know, no cases that he's ever pled to or been on the verge had to deal with weapons or guns.

THE COURT: Okay.

All right. So, let's go to argument quickly.

Mr. Edwards, do you want to start?

Oh, wait.

MR. EGBUONU: You know she's here in the court also?

THE COURT: The mom.

MR. EGBUONU: Yes, the mom is here.

THE COURT: Yeah.

Mom.

Okay.

MR. EGBUONU: If you can just stand up, please.

THE COURT: Just stand up for a minute.

MR. EGBUONU: Yeah.

THE COURT: Okay.

Got it.

MR. EGBUONU: Thank you.

THE COURT: All right. And then the other witness he can just stand up for a second also.

MR. EGBUONU: He's already – yeah. He's already up.

THE COURT: All right. So, I've laid eyes on ya'll.

All right. You can sit down.

All right. Let's go to argument, Mr. Edwards, briefly.

MR. EDWARDS: Yes, Your Honor.

Your Honor, you've heard the expression, you know, where there's smoke there's fire. You know, In this case, where there's fire there's fire, and we – we have three fires, Your Honor – not one, not two, but three. And, Your Honor, I just want to walk through the evidence a little bit. But, Your Honor, this presentation was to make the point to you that, you know, where the Defendant has problems he brings fires to problems.

In 2005, you know, an arson that he admitted to, an associate approached him about a problem, a guy that had an affair with that individual's girlfriend or beat her up. And so, the Defendant brought fire to that problem.

In April of 2020, John Lee Price presented him with a vehicle that ended up being stolen by a police officer, and that was a problem. And so, the Defendant brought fire to that problem.

And then, in June of 2020, Steve Rodgers decided to open up his own shop, and they had business disagreements with the Defendant, turned down his offer, you know, stole his crawfish supplier, became a competitor to business – business

to his, and he used John Lee Price and others to take care of that problem, Your Honor.

Your Honor, it is - it should be no surprise to you that an individual who's facing federal charges, although previously saying one thing, comes forward and tells the truth. John Lee Price was facing federal drug trafficking charges, and he came to us and he told - he didn't come to us but we found him, and he confessed to his role and the specific role of others, and that information is corroborated, Your Honor.

He told us that Lynn Price ordered, paid for the arson of the 5015 Bar. Well, the phone calls show at three in the - at - I'm sorry - 4:47, three minutes after the fire there's no coincidence that the only call he's making at that time is to Lynn Price, Your Honor. And he told us that Lynn Price answered the phone, told him, I already know about it and I'll meet you later. And he made payment to - to Mr. - to Mr. John Lee Price. And there are no other calls, Your Honor, between the hours of 1:00 a.m. and 8:00 a.m. between those two during the entire month of June.

And, Your Honor, that activity is consistent with what John Lee Price indicates was what they were up to. In 2018, he began, not on the books - he was not an employee of the Turkey Leg Hut, Your Honor, but he was working for Lynn Price in the shadows, stealing cars, stealing heavy

equipment and things of that nature as a side hustle for the Defendant. And so, he talks about this 2005 blue Nova.

And, Your Honor, the Agents went out, and they found the report of the blue Nova that was burned just like John Lee Price said. They found phone calls between John Lee Price and the Defendant during the time period in which the – that car was stolen, up until it was – it was burned, and then, those phone calls completely broke off. There were no phone calls the next day. They found the police officer whose vehicle was stolen, and so, all along the way, Your Honor, there are bits of information that corroborate what John Lee Price says. And it should be no surprise, obviously, that when facing a stiff sentence in a drug – in a drug trafficking charge, that he comes forward and tells the truth that he didn't tell in the beginning when the Government spoke to him.

And, Your Honor, you know, if the Government doesn't go out and when believe someone is suspected of doing something and always interview them, there's a reason the Agents didn't talk to Lynn Price is because he is the orchestrator. He is the one who tries to keep his hands clean. He is the one that has minions and mopes that do his dirty work.

I mean, Your Honor, you see from the witnesses that the Defense has proffered to that Mr. Price was a successful businessman. He did enjoy the privileges of

celebrity and fame and money and all the things of being the owner of a famous restaurant can bring to you. But, Your Honor, now the Turkey Leg Hut is in bankruptcy. You know, his marriage is in – is undergoing divorce proceedings, and now he is facing an Indictment and very serious charges. And so, to pardon the pun, Your Honor, for the Turkey Leg Hut owner, the turkeys have come home to roost, and that is a problem for him, Your Honor. And, you know, we argue danger to the community and we bring to you the kind of the body of work that he's committed with respect to criminal activity.

You know, Your Honor, the Defense made the point that – that we allowed him to stay on the streets while we were investigating this crime. Well, the question is, what was he doing while he was on the streets? I mean, in 2024, we know that he is putting the gun – he's pointing a weapon at a – at a Lyft driver. In 2024, we know that he is at Tipsey's Lounge attacking a 52-year old man and choking him to the point – excuse me – of that – that individual passing out.

We know that up until November of 2023 he's running – you know, he's – he's got a marijuana operation going in the Turkey Leg Hut, and he is branding the marijuana with Turkey Leg Hut packaging, along with John Lee Price. It's not just John Lee Price corroborates that but other witnesses that – that the Agent spoke to.

And, Your Honor, we didn't bring all of the

Government's evidence to you and all of the Government's witnesses, because we do have a concern that we have a - a high profile Defendant and so in some - in some sense we want to give you enough to make a decision on detention but not so much that we are already revealing the identities of other witnesses involved in this case, Your Honor.

And - and also, Your Honor, don't forget the testimony of Agent Cline that, you know, that she's been in contact with DPS investigators who are currently investigating a case involving the Defendant - identity theft, you know, stolen vehicles and things of that nature. So, while he has been free, you know, Your Honor, he has been absolutely active.

A few other points, Your Honor - this Defendant has not been honest with this Court. In that Pretrial Report, he was not honest about where he lived, because he knew he had weapons. He was not honest about the presence of weapons in his residence, because he knew he had weapons. He is a convicted felon who has not one, not two, but about six weapons - to include a flame thrower - I mean, as if to embrace what he does, which is commit arson. Times three the man owns a flame thrower, and there's only one thing you can do with a flame thrower and that's set things on fire. Now, we don't believe he was necessarily using it to - to set fire, but it is kind of telling that that's the type of thing that

he goes out and purchases.

Your Honor, we want you to remember also that while the Defendant was on supervised release, you know, after being released on those fraud charges, his supervised release ended in August, so while under supervision he was committing additional crimes – the blue Nova arson, the 5015 Bar arson.

And we also want you to remember, Your Honor, that there are – there are several – there's a Protective Order out against the Defendant, and he has been alleged to have violated that Protective Order on at least four occasions.

And, Your Honor, I think you'll see that when you look at his criminal history, when you look at the number of arrests and reports and allegations that – a lot of them are dismissed. That is part of the smoke, Your Honor. Where there's smoke, there is fire. We believe that the Defendant has enjoyed, you know, the celebrity, has enjoyed the connections, and in deed he has very rich and wealthy and famous people in this court testifying on his behalf. But they don't know what lies beneath, and what lies beneath is what John Lee Price tells you and that's that in the dark, in the shadows he is orchestrating other people to commit crimes on his behalf. And that's what – what occurred in this particular case, Your Honor.

So, you know, having said all that, Your Honor,

the Government believes that the Defendant is a danger to the community. We believe that because of his high profile nature, you know, he does have the ability and has shown the ability to threaten other witnesses like he threatened Steve Rodgers and –

And, you know, the Defense made it a point to say that there are no threats contained in that – that message that he sent to Steve Rodgers. But, Your Honor, remember what happened after that message. That message occurred in May of 2020. Well, in June, the Defendant in that message talks about you'll see what's going to happen, and Steve Rodgers tells us that he threatened to blow up the 5015 Bar. And it occurred, Your Honor. And so, since 2020 up until present day, he has been active and at it in terms of committing misconduct, and the Government doesn't believe that that will stop, Your Honor.

So, we think we've shown you, you know, beneath the celebrity who the Defendant is and why a detention is necessary and appropriate to – to protect the community from the Defendant.

Thank you, Your Honor.

MR. EGBUONU: Thank you, Your Honor.

THE COURT: Okay.

MR. EGBUONU: What I'm going to start with is what the Government has not proven first.

It has not proved by clear convincing evidence that there is not a combination of conditions that this Court can set that will insure the safety of the community. They have not met their burden, and let me tell you why, Your Honor.

The Government's attorney tries to talk about all these different things that are not factual. These are things that are inferred or things that have come out the words of a person that is currently under Indictment for trafficking over 12 kilos of Fentanyl.

Let's talk about what we do know, that the Government's own witness testified to today. We do know, and this is something that's undisputed that my client, Mr. Lyndell Price, was not present at 5015 the day of the fire. There were four individuals and Mr. Price was not - Mr. Lyndell Price was not one of them. What we also do know that's also undisputed is that Mr. John Price, who the Agent testified to is - they seem most of their case on was a person that never implicated my client until after he was arrested on federal drug trafficking charges where he was facing a mandatory minimum of at least 10 years. How can we believe him?

We've heard testimony that the threats that the Government tries to classify his threats on its face weren't threats. You heard the Agent testify that looking at these

text messages as an objective person she inferred that they weren't threats. Again, there were no acts of violence stated in these text messages. Just simply because the Government states that a fire happened afterwards is not indicative of any threats that can be attributed to my client.

The Government tries to hurry across and skate across when this fire happened. We can't do that, Your Honor. We have to look at these things and these allegations occurred back in 2020. The Government barely made their Statute of Limitations on these cases, Your Honor. They – the Agent testified that they had been investigating him since 2022.

Mr. Price – Mr. John Price is being cooperating since 2023. Still in April of 2025 is now when they bring in Mr. Lyndell Price with these accusations, with these allegations, but he has been in the community for almost five years and there is no evidence of him threatening or intimidating witnesses. They try to bring the individual that he has a business dispute over – or a business dispute with and try to muddy the waters and say that these text messages are laced with profanity were threats. They weren't. The Agent said it herself. They were not threats. They were arguments over various business disputes. Could Mr. Price have articulated himself better? Sure. But they weren't threats.

Next, even after John Price's cooperation, there

was no urgency to get who they now allege is this dangerous individual off the street. He was on the street and in the community doing the good work, Your Honor, the good work of the community – cutting down trees when a storm hits. They don't want to talk about that, Your Honor – helping elderly people, Your Honor, that didn't have the means to do it.

You heard Mr. Kenloch testify that when one of the most vulnerable times in his life Mr. Price, when he didn't have to, stood up and gave that level of support for him and his family. And that's something that representative of what Mr. Price, Mr. Lyndell Price does for the community, not what the Government's alleging on a number of cases that have been dismissed.

They're alleging cases that have been dismissed, Your Honor, about incidents that happened at Tipsey's. You can look at the Pretrial Services Report yourself. Those cases were dismissed.

Based on our understanding of the Statute, it's our position that the Government hasn't met its burden, and this is not a presumption case. So, the default is release. And we un- -- but we understand that the Court is not going to release Mr. Lyndell Price with an unsecured bond, and that's not what we're asking.

What we're asking is, bond that is consistent with his co-Defendant. Every single co-Defendant that

actually was here at 5015 on the night of the fire, Mr. John Price is the one holding the fire, he's out on bond. Mr. John Price who's been trafficking one of the most deadliest drugs in America is out on bond.

Mr. Armani Williams, who has confessed to his involvement, is out on bond. And Mr. – Mr. Armani Williams he confessed, but he never pointed a finger at Mr. Wyndell – Lyndell Price. The only evidence and only statements they have is of a drug trafficking individual that is facing a mandatory minimum in federal court.

So again, we're asking for conditions that are consistent with their release, because the Government didn't think they were a danger, even though they're the ones at the scene burning the vehicles. Mr. Price – Mr. John Price was the individual that burned the Chevy Nova. We understand that Mr. Lyndell Price does have the prior tax case, which is a non violent crime, but he's done his time. He successfully completed supervised release. That is undeniable.

The Government hasn't even moved on the flight risk, but even if they did, multiple witnesses have come to court, stayed here for hours just to testify and tell you what – how good of a person and the ties that Mr. Lyndell Price has to the community. So, it's our position that that's also been established.

Again, Your Honor, it's our position – I

apologize, Your Honor - it's our position that the Government has not met its burden of clear and convincing evidence that this Court cannot set a combination or a condi- -- or a combination or conditions that will reasonably secure the safety of this community.

You heard evidence that Mr. Price has good character. You seen the pictures yourself. His past conduct does not -

THE COURT: I - you know what - I did not get those pictures.

MR. EGBUONU: Oh, sorry, Your Honor.

THE COURT: They're -

MR. EGBUONU: You just want -

THE COURT: You can give - yeah, you can give me those.

MR. EGBUONU: Sorry.

His past conduct is not controlling - is not controlling in this case, because they're either dismissed, which most of them that Mr. Edwards referred to were dismissed; more importantly, there were misdemeanors or they were deferred adjudicate - deferred adjudications that did not result in a conviction. So, that also further shows that Mr. Price can do what he needs to do if conditions are set by this Court.

In closing, the Government has not met its

burden. It has not shown Mr. – Mr. Lyndell Price to be a flight risk is that it's not met its burden by clear and convincing evidence that there are no combination of conditions that can be put in place that would not insure the danger to the community.

And we would ask this Court to deny their motion and set conditions consistent with his co-Defendants in this case.

Thank you, Your Honor.

THE COURT: Okay. I am going to take this matter under advisement.

I thank you for all of your hard work and, you know, excellent advocacy on both sides, but there's lots to think about here and I'm going to chew on it.

MR. EGBUONU: Thank you, Your Honor.

MR. EDWARDS: Thank you, Your Honor.

THE COURT: Thank you.

Okay. And we're going to take a short little, five-minute, break.

You need to talk to me?

(Proceedings concluded at 12:20 p.m.)

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

I, Linda Griffin, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Linda Griffin
Linda Griffin

November 8, 2025
Date